**Thomas S. CARPENTER and Elliott Taylor, Appellants,**

v.

**HARRIS, UPHAM & COMPANY, INC., Appellee.**

**Joseph WARREN, III, Mark B. Edwards, and Edwards & Warren, Professional Association, Appellants,**

v.

**HARRIS–UPHAM AND COMPANY, Appellee.**

**Eldo GROGAN, William Mills, and Gene Patton, Appellants,**

v.

**HARRIS, UPHAM & COMPANY, INC., Appellee.**

**Michael B. ALLRAN, Edward R. Anderson, A. J. Beall, Jr., Anne C. Hawley, Barbara Morgan, Robert S. Morgan, G. F. Parker, Samuel White, R. W. Cannon, Dominic Capelli, Pauline Capelli, Frank W. Cayce, John Gaylord, Jr., John A. Jenks, Frank Manship, Appellants,**

v.

**HARRIS, UPHAM & COMPANY, INC., Appellee.**

Nos. 77–2051, 77–2052, 77–2181, 77–2182.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1978.

Decided March 13, 1979.

6. *E. g., Binnings, Inc. v. Roberts Construction Co.,* 9 N.C.App. 569, 177 S.E.2d 1 (1970).

Harry C. Hewson, Charlotte, N. C. (Jones, Hewson & Woolard, Charlotte, N. C., on brief), for appellants in No. 77–2051.

William E. Underwood, Jr., Charlotte, N. C. (Caudle, Underwood & Kinsey, Charlotte, N. C., on brief), for appellants in No. 77–2052.

J. Douglas Stewart, Gainesville, Ga. (Telford, Stewart & Stephens, Gainesville, Ga., on brief), for appellants in No. 77–2181.

Robert G. McClure, Jr., Asheville, N. C. (Long, McClure & Dodd, Asheville, N. C., on brief), for appellants in No. 77–2182.

James H. Abrams, Jr., Charlotte, N. C. (William K. Diehl, Jr., James, McElroy & Diehl, Charlotte, N. C., on brief), for appellee in Nos. 77–2051, 77–2052, 77–2181 and 77–2182.

Before WIDENER and HALL, Circuit Judges, and HOFFMAN,* Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge:

These cases are appeals from summary judgment granted in favor of Harris, Upham & ·Company, Inc. (Harris, Upham), a securities brokerage firm. The appellants sought to hold Harris, Upham liable for losses appellants incurred as purchasers of unregistered securities. The scheme involved investment in cattle and grain contracts purchased from companies operated by Wallace McKinney, a Kansas rancher. A central figure in the sale of the contracts was Gresham Northcott, a commodities broker employed by Harris, Upham's Charlotte, North Carolina, office until February 1, 1974. The losses which appellants sought to recoup were suffered on contracts purchased *after* Northcott left the employ of Harris, Upham. Appellants attempted to establish that the brokerage firm was a "controlling person" under Section 15 of the Securities Act of 1933 (15 U.S.C. § 77($l$ and $o$)) and/or Section 20 of the Securities Exchange Act of 1934, (15 U.S.C. § 78 (j and t)). Following extensive discovery, the district court granted summary judgment, holding that there was no theory which would support a judgment against Harris, Upham based on actions taken by Northcott after he left the firm's employ.[1] We affirm.

---

* Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. The order granting summary judgment contains no formal opinion. The only pertinent statement is as follows:

> I know of no theory that can support a judgment against Harris, Upham based on actions taken by Gresham Northcott after he left Harris, Upham's employ. Plaintiffs contend that Harris, Upham could have made a report to the New York Stock Exchange which may have resulted in the Stock Exchange's calling Northcott to the attention of the Securities & Exchange Commission which might have been able to stop Northcott before he injured plaintiffs. This tenuous chain is not sufficient to place Harris, Upham within the definition of a seller (or aider and abetter) or a controlling person as those terms are used in the relevant portions of the 1933 or 1934 Securities Acts.

Many actions arose from losses suffered from investment in the McKinney operation and were consolidated for trial. Appellants (plaintiffs below) in Nos. 77–2051, 77–2181 and 77–2182 were purchasers of cattle or grain contracts. Appellants in No. 77–2052 (defendants and third-party plaintiffs below) sought indemnity and contribution from Harris, Upham for any liability which they or their law firm might suffer as a result of Northcott's actions. Since we hold that Harris, Upham could not have been liable as a controlling person under the facts of this case, summary judgment is affirmed as to all appellants.

The McKinney Cattle Company was engaged in feeding cattle prior to selling them to packing houses. In 1972 Northcott, while employed as a commodities broker for Harris, Upham, met McKinney in Kansas and solicited commodities business from him. McKinney became a customer of Harris, Upham, with Northcott as his registered representative.[2] Sometime in late summer or early fall of 1972, McKinney and Northcott began feeding cattle by means of subchapter-S corporations.[3] Three such corporations were formed. Those persons who became shareholders in these three corporations invested no cash, but instead filed financial statements with a Kansas bank showing a net worth of sufficient amount to allow the bank to loan the money which funded the corporations. Investors hoped to receive an immediate personal income tax deduction for the value of the grain purchased to feed the cattle, and anticipated converting ordinary income into capital gains upon liquidating the corporations within two years. Claude L. Ives, Jr., office manager for the Harris, Upham office in Charlotte, became a shareholder in one of the subchapter-S corporations, along with Northcott. There is no evidence that this was ever more than a private investment for Ives, or that he ever recommended similar investments to Harris, Upham customers or anyone else.

In 1973 McKinney began to offer other modes of investment in cattle feeding. Investors began purchasing cattle on an oral basis from McKinney. Later in 1973 such purchases were transacted in the form of letter agreements. Finally, McKinney began using form contracts which had been revised by the lawyer defendants involved in this appeal. All of the above transactions were represented to be purchases of specific lots of cattle, ostensibly avoiding the registration requirements of the securities laws. Each contract would provide for the purchase of a given number of cattle, which were represented to have been presold to packing houses at a prearranged price. Each investor's profit on the transaction was thus "guaranteed". However, by the spring of 1974 the basic plan had changed from one where McKinney actually held cattle for feeding to one where he attempted to cover contracts by buying and selling on the commodities market. New investor money was used to pay off existing investor contracts which had become due during the summer of 1974. This variation of the "Ponzi" scheme collapsed under its own weight in December, 1974, when McKinney was no longer able to pay contracts as they became due. According to McKinney's deposition, investors were nev-

The foregoing order was entered on April 20, 1977. On May 13, 1977, a final judgment of dismissal of the claims on which summary judgment was granted was entered in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.

As to No. 77–2052 in which both Edwards and Warren, et al., and Harris, Upham were defendants, the motion for summary judgment filed by Harris, Upham is to the cross-claim for indemnity and contribution filed by Edwards and Warren, et al.

Several original plaintiffs did not appeal. It should also be noted that, in addition to Harris, Upham, there were many other defendants but the record does not disclose the disposition of the cases as to these defendants.

2. At the time McKinney opened his account, Harris, Upham investigated McKinney by checking with the Hutchinson National Bank and Trust Company in Hutchinson, Kansas, and determined that he was a man of substance who was in fact a legitimate cattle trader who hedged his own cattle.

3. 26 U.S.C. § 1371, et seq.

er informed of the change in operation.[4] Investors discovered in November or December, 1974, that McKinney did not have enough cattle to meet the requirements of the outstanding contracts.

In February, 1973, Ives had noticed that margin calls had been made on hedging accounts for some of Harris, Upham's customers. He inquired of Northcott if those people were buying cattle from McKinney. Northcott admitted that he had referred to McKinney any customers who inquired about buying cattle, but stated that he was not receiving any compensation for such referrals. Ives testified in his deposition that he directed Northcott to stop making such referrals; Northcott denied that he was ever given such instructions. In large part appellants' suits are based on Northcott's allegations that Ives must have been aware that Northcott was continuing to refer individuals to McKinney because of Northcott's activities in the office and because of correspondence which Northcott received at the office.[5] However, Northcott admitted that he never discussed the referrals with Ives, that he never showed the contracts to anyone at Harris, Upham, and that he never sought an opinion from Ives or the compliance department regarding the legality of the contracts.[6] Only one piece of correspondence was received by Northcott at the office prior to November, 1973.[7]

During 1973 Northcott was out of the office quite often and his production as a commodities broker declined sharply. When Ives brought this to his attention, Northcott attributed the decline to unfavorable conditions in the commodities market, and stated that he was attempting to obtain new accounts. It is now apparent that Northcott had begun to devote a large portion of his efforts to soliciting investors for McKinney. In early December Ives learned from a chance comment by a customer that Northcott had recommended that the customer consider investing in cattle. Ives immediately confronted Northcott, learned that he was still referring people to McKinney, and ordered him to stop making such referrals and to produce a list of those whom he had already introduced to McKinney. Ives then wrote to Robert Q. Jones, a vice president of Harris, Upham and Ives' immediate superior, and stated that he intended to terminate Northcott because of his poor production and because his outside activities were interfering with his performance as a broker. At Northcott's request, Jones, Ives and Northcott met to discuss the matter. Northcott again stated that he had merely introduced people to McKinney, that he had received no commissions from the referrals, and that he had made it clear to the people he referred that Harris, Upham had nothing to do with the cattle feeding program.[8] Northcott agreed to produce a list of those whom he had referred to McKinney.

Two weeks later, on January 17, 1974, Northcott returned to the Harris, Upham office and voluntarily submitted his resignation effective February 1, 1974. He parted on generally amicable terms. When asked by Ives if he had prepared a list of referrals, Northcott stated that the information was not available.[9]

On January 21, after receipt of Northcott's letter of resignation, Jones wrote to Ronald Veith, compliance director for Harris, Upham. Included in the letter was a summary of what Jones had learned from Ives and Northcott concerning the reasons for Northcott's termination. Based on the information in Jones' letter, Veith recommended that Northcott be given a clean release. Thereafter an RE–4 form was submitted to the New York Stock Ex-

4. Appendix p. 726–28.

5. Correspondence received by registered representatives at their offices of employment is opened by their employers for the purpose of supervising their activities pursuant to stock exchange rules.

6. Appendix p. 776–84.

7. See Appendix p. 501–02.

8. Appendix p. 785.

9. Appendix p. 495–97; Appendix p. 544.

change which contained no negative comments concerning Northcott.[10]

Following Northcott's termination, Harris, Upham personnel had very little contact with Northcott or McKinney. Early in 1974 one broker at the Harris, Upham office received several checks from BeTex Corporation, the entity through which Northcott began operating upon leaving the brokerage firm. The checks allegedly represented finders' fees which the broker split with Northcott, but do not involve any of the appellants in this case. McKinney continued to maintain a commodities account at Harris, Upham. In October, 1974, Ives received the proceeds from the liquidation of the subchapter-S corporation in which he had invested. Incidentally, Ives was replaced as office manager by Cantwell on January 15, 1974.[11] Ives, however, retained his employment.

It is pertinent to note the relationship of the litigants to Harris, Upham & Company. Of the twenty plaintiff-appellants before this court, only three maintained what may be termed active accounts at Harris, Upham. Three or four others had either inactive accounts or had at one time conducted an isolated trade through the firm. The remaining individuals had no contact whatsoever with Harris, Upham. *All of the contracts involved in this suit were executed after Northcott left the firm.* Appellants argue that all contracts were part of a series of transactions. However, nine of the appellants herein did not purchase their *first* contract until after Northcott's termination. Most of the appellants were not directly solicited by Northcott, but instead learned of the investment opportunity from three of the appellants who had been solicited by Northcott.

■ We have traced the development of the cattle feeding operation in some detail. The investment program in grain contracts, involving corn and milo leaseholds, was not created until at least March of 1974. We note at the outset that there is no evidence that Harris, Upham had any knowledge whatsoever that Northcott was planning to recommend investments in *grain contracts* while he was an employee of the firm.[12] Harris, Upham's control over Northcott, as well as any duty to supervise his future activities, terminated upon his separation from the firm. Summary judgment as to all claims based on grain contracts is therefore affirmed without further discussion.

■ Liability as a controlling person for acts committed by persons in one's control is found in both the 1933 Act and the 1934 Act. Section 15 of the 1933 Act, as amended, 15 U.S.C. § 77o, provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Section 20 of the 1934 Act, 15 U.S.C. § 78t(a), similarly provides in part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Noteworthy in each provision is the inclusion of a defense from liability based on "good faith" or lack of knowledge or rea-

---

**10.** Appendix p. 744.

**11.** Appendix p. 529.

**12.** Appendix p. 769.

sonable belief. When originally passed by Congress, § 15 of the 1933 Act held controlling persons absolutely liable for § 11 and § 12 violations by controlled persons.[13] Congress, in passing the 1934 Act, amended § 15 of the earlier Act, adding the language beginning at "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist." Likewise, the controlling person provision in the new Act, § 20(a), contained the "good faith" defense to liability. Clearly Congress had rejected an insurer's liability standard for controlling persons in favor of a fiduciary standard—a duty to take due care. *Securities and Exchange Commission v. Lum's, Inc.,* 365 F.Supp. 1046, 1063 (S.D.N.Y.1973); see Annot. 32 A.L.R. Fed. 714, 719. The intent of Congress reflected a desire to impose liability only on those who fall within its definition of control and who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person. *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2nd Cir. 1973). The Supreme Court has noted that in each instance where Congress has created express civil liability in favor of purchasers or sellers of securities, it has clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 207–209, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The controlling persons provisions contain a state-of-mind condition that requires a showing of something more than negligence to establish liability. *Id.* at nn. 27–28.

■ The most obvious manner in which to establish liability as a controlling person is to prove that a person acted under the direction of the controlling person. This most commonly occurs in an employer-employee relationship. The lack of such a

relationship is not determinative, however. *Hawkins v. Merrill Lynch, Pierce, Fenner & Beane,* 85 F.Supp. 104 (W.D.Ark.1949). In order to satisfy the requirement of good faith it is necessary for the controlling person to show that some precautionary measures were taken to prevent an injury caused by an employee. *Securities & Exchange Commission v. First Securities Company of Chicago,* 463 F.2d 981, 987 (7th Cir. 1972); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1210 (9th Cir. 1970). *See also, Zweig v. Hearst Corporation,* 521 F.2d 1129, 1134–35 (9th Cir. 1975).

■ The primary duty owed by a broker-dealer to the public is to supervise its employees in an adequate and reasonable fashion. While the standards of supervision may be stringent, this does not create absolute liability for every violation of the securities laws committed by a supervised individual. *SEC v. Lum's, Inc.,* 365 F.Supp. at 1064. It is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner. *Hecht v. Harris, Upham & Co.,* 430 F.2d at 1210.

■ There is no evidence in this case that Northcott was acting at the direction of Harris, Upham at any time that he referred persons to McKinney. What evidence there is indicates very strongly that he was told *not* to make such references. Northcott never showed the cattle contracts to anyone at Harris, Upham, he never discussed them with his superiors, and he admitted that he was not hired to obtain purchasers for such investments. Thus there is no evidence that Harris, Upham exercised direct or indirect control over Northcott's activities with McKinney. The only possible theory of recovery for these appellants would require them to allege facts which, if proved, would establish that Harris, Upham failed to ade-

---

13. Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. 1933 Act, ch. 38, § 15, 48 Stat. 84.

quately supervise Northcott's dealings while he was employed by the firm.

We find no facts in the record which would support the allegation that Harris, Upham was negligent in its supervision of Northcott. The firm properly opened Northcott's incoming mail. Viewed without benefit of hindsight, the correspondence introduced into the record does not indicate any wrongdoing on Northcott's part concerning possible securities violations. Northcott's initial explanation that his loss of production was due to the commodities market was plausible. His decision to resign voluntarily in order to go into business for himself was reasonable in light of his continuing low production. The firm was careful to ascertain that Northcott was not obtaining commissions for his referrals to McKinney, and Northcott denies that he obtained such commissions prior to January, 1974.[14]

We reiterate that there is no evidence that Harris, Upham was aware that the McKinney operation entailed possible securities violations. Without facts indicating such knowledge on the part of the firm, there is no evidence of "something more than negligence" on the part of Harris, Upham. *Ernst & Ernst v. Hochfelder, supra,* at n. 28.

█ Appellants have emphasized the failure of Harris, Upham to submit a more complete RE–4 form entitled "Notice of Discontinuance of Registered Employee" dated February 1, 1974, the same date that Northcott's resignation became effective. They argue that the negative answers given to question 8 prompted the continuation of Northcott as a registered representative when, had an investigation been conducted, Northcott would have been deprived of his privileges as a registered representative and the losses in dispute might not have occurred. We agree with the district court who described the situation as a "tenuous chain." As far as Harris, Upham is concerned, the record merely discloses knowledge of referrals of appellee's customers or other persons to McKinney. Perhaps a thorough investigation would have revealed more, but Harris, Upham, at least in December 1973, and perhaps as early as February 1973, directed Northcott to stop making these referrals. At best, Harris, Upham was guilty of simple negligence which, as heretofore stated, is not sufficient to establish liability. Under no circumstances was the RE–4 form a false statement in fact.

It is difficult to consider a complex case of multi-party litigation on appeal from summary judgment without the benefit of an opinion of the trial court, particularly when the good faith of one of the parties is at issue. After reading over five thousand pages of depositions taken during the extensive pretrial discovery in this case, this court can say with conviction that a *prima facie* case of bad faith on the part of Harris, Upham has not been sufficiently alleged. We note with approval the opinion of Judge Ward in *Parsons v. Hornblower & Weeks-Hemphill, Noyes,* 447 F.Supp. 482 (M.D.N.C. 1977), *aff'd per curiam,* 571 F.2d 203 (4th Cir. 1978), which granted a motion for summary judgment in a complex securities case:

> The Court fully realizes that summary judgment is not a device to dispose of factual disputes. However, if a motion for summary judgment reveals that there is no genuine issue as to any material fact, then summary judgment is appropriate even in cases that, at first blush, appear to involve complex factual and legal issues. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).
>
> The United States Court of Appeals for the Fourth Circuit has described the function of summary judgment as follows:
>
> [T]he function of a motion for summary judgment is to smoke out if there is any case, i. e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition. *Bland v. Norfolk*

**14.** Appendix p. 479; Appendix pp. 542–43.

*& Southern Ry. Co.,* 406 F.2d 863, 866 (4th Cir. 1969).

The briefs, affidavits, and other materials filed by the parties in connection with the present motions have served this function.

447 F.Supp. at 487.

This court is of the opinion that summary judgment is appropriate in this case.

Appellants in No. 77–2182, Allran, et al, have alleged as an alternative theory of recovery that Harris, Upham is primarily liable for their losses, and that the firm is liable as an aider and abettor or under a conspiracy theory. For the reasons stated above, there are no facts to support any of those theories of recovery.

The lawyer-appellants seek contribution or indemnification from Harris-Upham. Since we affirm summary judgment as to all claims, there is no ground on which to hold the firm liable as a joint tortfeasor. Summary judgment is therefore affirmed as to the lawyer-appellants' claims.

AFFIRMED.