Arthur HUNT; J. Edgar Ramsey,
Plaintiffs–Appellees,

v.

Michael L. MILLER; Roberts, Cogburn,
McClure and Williams, a Partnership,
Defendants–Appellants,

and

Interstate Securities Corporation;
William C. Jordan; James E.
Bradley, Jr., Defendants.

MANUAL WOODWORKERS, INC.,
Plaintiff–Appellee,

v.

Michael L. MILLER; Roberts, Cogburn,
McClure and Williams, a Partnership,
Defendants–Appellants,

and

Interstate Securities Corporation;
William C. Jordan; James E.
Bradley, Jr., Defendants.

Arthur HUNT; J. Edgar Ramsey,
Plaintiffs–Appellees,

v.

INTERSTATE SECURITIES CORPORA-
TION, Defendant–Appellant,

and

William C. Jordan; James E. Bradley, Jr.;
Michael L. Miller; Roberts, Cogburn,
McClure and Williams, a Partnership,
Defendants.

MANUAL WOODWORKERS, INC.,
Plaintiff–Appellee,

v.

INTERSTATE SECURITIES CORPORA-
TION, Defendant–Appellant,

and

William C. Jordan; James E. Bradley, Jr.;
Michael L. Miller; Roberts, Cogburn,
McClure and Williams, a Partnership,
Defendants.

Nos. 89–2315, 89–2316, 89–2331
and 89–2332.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1990.

Decided July 18, 1990.

As Amended Aug. 16, 1990.

Rehearing Denied in Nos. 89–2331,
89–2332 Aug. 21, 1990.

Jeffrey Jude Davis, Moore & Van Allen, James Patrick Cooney, III, Kennedy, Covington, Lobdell & Hickman, Charlotte, N.C., argued (James E. Walker, Kennedy, Covington, Lobdell & Hickman, Douglas M. Martin, Poyner & Sprull, Charlotte, N.C., on the brief), for defendants-appellants.

William Kase Diehl, Jr., James, McElroy & Diehl, P.A., Charlotte, N.C., argued (J. Mitchell Aberman, Mark T. Calloway, James, McElroy & Diehl, P.A., Charlotte, N.C., Edmund A. Waller, Gainesville, Ga., on the brief), for plaintiffs-appellees.

Before PHILLIPS and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.

SPROUSE, Circuit Judge:

These consolidated appeals involve claims of securities fraud and professional negligence arising from the sale of partnership interests in a real estate venture. The district court entered judgments on varying theories of liability against Interstate Securities Corporation; Interstate broker William Jordan; and attorney Michael Miller and his law firm, Roberts, Cogburn, McClure and Williams (hereafter Miller). Interstate and Miller appeal.[1] We affirm as to Interstate, but reverse as to Miller and remand for a new trial.

## I. *Facts*

The chain of events leading to this action began in the fall of 1984 when James Bradley met Interstate broker William Jordan. Bradley was trying to buy certain real estate bordering Lake Lanier, in Dawson County, Georgia, for development as a resort. He had twice failed to close on the land, but had a third option on the site. Bradley testified that Jordan showed him documents illustrating how Interstate had handled private placement financing for similar projects and that Jordan met with him and the owner of the lakefront property to structure a new purchase arrangement. As a result of that meeting, Bradley did not close his existing option, thereby forfeiting a $30,000 deposit. Instead, the landowner and Bradley drew new contracts requiring a nonrefundable $330,000 deposit on a purchase price of $3.3 million. Bradley testified that Jordan claimed Interstate would handle the financing and the law firm that represented Interstate would do the legal work.

Jordan admitted that he talked to Interstate's real estate department and was told the brokerage did not get involved in property development deals. He nevertheless approached several of his Interstate clients.

One was Lemuel Oates, the president of a family-owned company called Manual Woodworkers, Inc. Jordan also contacted Arthur Hunt and Edgar Ramsey, the co-managers of an Asheville, North Carolina plant, who often made joint investments. Manual Woodworkers, Hunt, and Ramsey were the plaintiffs below and are the appellees before us.[2]

Jordan represented that "Dawson Realty" (a limited partnership with Jordan and Bradley as general partners) already owned the land in Georgia, but that investor funds were needed as cash collateral on a loan. He offered Oates, Hunt, and Ramsey the opportunity to buy $80,000 units in the limited partnership. He claimed investors would receive: (1) their investment back in ninety days; (2) interest at three percent above the prime rate; (3) $20,000 in cash; and (4) a continuing three percent equity interest in the development project. Jordan told Oates, Hunt, and Ramsey that their investments would be secured by a mortgage on part of the property.

Hunt and Ramsey each bought a unit in Dawson Realty on December 12, 1984. On December 14, Jordan approached attorney Michael Miller about drawing up the necessary documents. At a December 21 meeting, Miller asked Jordan if he had a private placement memorandum on Dawson Realty; Jordan replied that he did not. Miller had worked with Jordan on several Interstate projects. He also represented Oates and the company that Hunt and Ramsey managed.

Oates had not yet committed any money to Dawson Realty, but during December he established a number of accounts with Interstate. Jordan introduced him to Interstate personnel and met with him at the Interstate offices. Jordan and Oates discussed Dawson Realty and other investments. Oates testified that he called Miller from Jordan's office on December 31 to discuss Dawson Realty and that Miller reassured him about certain details of the investment. Eighty thousand dollars were

---

**1.** Jordan is not a party to this appeal.

**2.** Another Interstate client, Nancy Ronemus, also invested in Dawson Realty. She is not a party to this action.

subsequently wire transferred from Manual Woodworkers' account with Interstate to Dawson Realty, and the transaction was entered in Interstate's computer system.

On January 16, 1985, Jordan showed Hunt and Ramsey drafts of a partnership agreement and promissory notes, apparently the first documents the investors had seen. The notes were partially handwritten; Jordan told Hunt and Ramsey that Miller had been busy and had just written the papers. When Hunt and Ramsey observed that the notes did not mention their equity interest in the development, Jordan wrote it in. The investors identified other discrepancies in the notes and the partnership agreement and declined to sign the documents pending receipt of new drafts. Ramsey subsequently received a call from Miller on January 24. Ramsey testified that Miller asked him to read the promissory note over the telephone and that Miller said, "I wish Bill Jordan would stop trying to be a lawyer and stop doing these things himself." Ramsey also testified that Miller claimed that he had seen the Lake Lanier property and that it was a good deal.

In early February, Jordan told Hunt, Ramsey, and Oates that more units in Dawson Realty had become available. Oates testified that he consulted with Miller and, on Miller's advice, invested an additional $80,000 from the Manual Woodworkers trust fund. Hunt and Ramsey bought an additional unit between them, increasing their investment by $40,000 each. These funds, along with the $240,000 Jordan had already obtained from the investors, were transferred to the owner of the Lake Lani-

er frontage as the nonrefundable deposit on the property.

Miller testified that the scope of his representation expanded during late January and February, as Jordan asked him to research other legal issues concerning the Dawson project. In late February, Jordan indicated to Miller that he was having trouble raising enough money to buy the property. However, Jordan did not actually admit the funds were not available to complete the purchase until mid-March, during the scheduled closing. At that time, Miller contacted Oates, Hunt, and Ramsey to tell them they may have been defrauded. Oates/Manual Woodworkers lost $160,000; Hunt and Ramsey lost their combined investment of $240,000.

## II. *Procedure Below*

Manual Woodworkers, Hunt, and Ramsey brought actions against Jordan, Interstate, Bradley, and Miller, alleging violations of federal and North Carolina securities laws,[3] common law fraud, breach of fiduciary duty, professional and ordinary negligence, and other claims.[4] Bradley crossclaimed against Jordan and Interstate. The cases were consolidated for trial.

After a three-week trial, the jury returned a verdict in the form of answers to special interrogatories. As to the investors' claims against Jordan and Interstate, the jury found: Jordan was liable for selling unregistered securities, securities fraud, and common law fraud; Interstate was negligent and had breached its fiduciary duty; Interstate was a "controlling person"[5] of Jordan and had failed to prop-

**3.** Securities Act of 1933 §§ 5 & 12, codified at 15 U.S.C. §§ 77e & 77*l*; Securities Exchange Act of 1934 § 10(b), codified at 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder; N.C.Gen. Stat. § 78A–56.

**4.** The district court granted the defendants summary judgment as to the other claims and they are not here in issue.

**5.** Both the federal and North Carolina security laws include "controlling person" liability provisions. The Securities Exchange Act of 1934 § 20, codified at 15 U.S.C. § 78t(a), provides in part:

Every person who, directly or indirectly, controls any person liable under any provi-

sion of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

A similar provision may be found in the Securities Act of 1933 § 15, codified as amended at 15 U.S.C. § 77*o*. The controlling person provision of the North Carolina Securities Act, § 78A–56(c), has been interpreted by reference to federal law. *Cf. Waterman v. Alta Verde*

erly supervise him; and Jordan's conduct was of the same nature as that authorized by Interstate and within the scope of his apparent authority as an Interstate employee. As to the investors' claims against Bradley and Bradley's crossclaim against Jordan and Interstate, the jury found: Bradley was not liable for the investors' losses; Jordan had committed a fraud against Bradley; and Jordan's conduct was of the same nature as that authorized by Interstate and within the scope of his apparent authority as an Interstate employee. Finally, the jury found that Miller was professionally negligent.

After remittitur,[6] the court entered judgment awarding the following compensatory damages: $160,000 to Manual Woodworkers, for which Jordan, Interstate, and Miller were jointly and severally liable; $160,000 to Hunt and Ramsey for their December investment, for which Jordan and Interstate were jointly and severally liable;[7] an additional $80,000 to Hunt and Ramsey for their February investment, for which Jordan, Interstate, and Miller were jointly and severally liable; and $30,000 to Bradley, for which Jordan and Interstate were jointly and severally liable.

In its special verdict, the jury also found the following punitive damages: for Manual Woodworkers—$320,000 against Jordan and $80,000 against Interstate; for Hunt and Ramsey—$480,000 against Jordan and $80,000 against Interstate; and for Bradley—$70,000 against Jordan and no damages against Interstate.[8] The district court concluded that Interstate was liable for the punitive damages awarded against Jordan because Jordan was acting within the scope of his apparent authority. The

court therefore entered judgment holding Jordan and Interstate jointly and severally liable for the following punitive damages: $320,000 to Manual Woodworkers, $480,000 to Hunt and Ramsey, and $70,000 to Bradley.[9] Jordan and Interstate were also ordered to pay attorney fees for Hunt, Ramsey, and Manual Woodworkers. Jordan, Interstate, and Miller were ordered to pay costs.

Interstate and Miller appeal.

### III. Issues Raised by Interstate

#### A. Liability to Investors

■ The judgments against Interstate are based on breach of fiduciary duty, negligence, the brokerage's responsibility as Jordan's controlling person, and principles of *respondeat superior*.[10] Interstate makes a largely factual argument that the investors knew Interstate was not involved in Dawson Realty and that Interstate therefore cannot be liable for their losses. This proposition turns on Interstate's contention that the contemplated Lake Lanier resort was a two-stage project—land acquisition followed by development—and that Hunt, Ramsey, and Oates knew Interstate was not involved in the first stage. Interstate supports this assertion by pointing to testimony that Interstate was not involved in the planned land purchase and that Interstate's name did not appear on the Dawson Realty documents.

The jury clearly rejected Interstate's theory that the two-stage character of the deal should relieve it of liability.[11] Abundant record evidence supports the verdict. Jordan testified that he discussed the Dawson

---

*Indus.*, 643 F.Supp. 797, 809 (E.D.N.C.1986), aff'd, 833 F.2d 1006 (4th Cir.1987) (table).

6. The remittitur is not at issue in this appeal.

7. The court directed a verdict in favor of Miller as to the initial investment by Hunt and Ramsey. That decision is not at issue in this appeal.

8. No punitive damages were awarded against Miller.

9. To avoid a potential problem with double recovery, *see generally Clifford v. River Bend Plan-*

*tation*, 55 N.C.App. 514, 522, 286 S.E.2d 352, 356 (1982), the plaintiffs elected to recover only the punitive damages awarded against Jordan (for which the court had found Interstate liable).

10. *See infra*, part III.D.

11. Interstate also urges that a separate interrogatory should have been submitted to the jury concerning whether the investors knew that the Dawson partnership investments were private transactions. We think the special verdict questions on controlling person responsibility and apparent authority covered this point.

partnership and various Interstate securities in the same conversation with one investor and that "I was an employee and representative of Interstate that whole time." He operated out of his Interstate office in his dealings with the investors, received mail there concerning Dawson Realty, and in at least one case transferred money for the Dawson investment out of an investor's Interstate account. The transfer was recorded on Interstate's computer system but was never questioned by Interstate managers, who were responsible for monitoring all transactions and who admitted that Jordan required more supervision than any other employee in Interstate's Asheville office.

After hearing this evidence, the district court denied Interstate's motion that a verdict be directed in its favor. We cannot disturb this holding unless, "without weighing the evidence or assessing witness credibility, we conclude that reasonable people could have returned a verdict only for the defendants." *Cooper v. Dyke*, 814 F.2d 941, 944 (4th Cir.1987). We think the evidence was more than sufficient to submit to the jury, which found Interstate liable under federal and state securities laws and the common law of North Carolina.

**B. Bradley's Claim**

■ Interstate asserts that the district court erred in failing to direct a verdict against Bradley on his crossclaim. Interstate insists that Jordan's conduct could not have caused Bradley's losses, because Bradley's money was invested before the two men met. However, Bradley testified that he continued to commit his money and energy to planning the lakefront development after Jordan and Interstate assumed responsibility for its financing. Bradley said that he met with surveyors and engineers, personally paying for surveys, salaries, printing, and a lease.

Again, considering this evidence under the standard of review described above, *see*

**12.** But see part **IV.,** *infra,* discussing the contributory negligence argument raised by Miller,

*Cooper,* 814 F.2d at 944, we cannot conclude that the trial court erred in allowing Bradley's claim to go to the jury.

**C. Jury Instructions**

Interstate next urges that it is entitled to a new trial because of two omissions from the jury instructions. Relying on our decision in *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), Interstate contends that it cannot be held liable for Jordan's actions absent a finding of "culpable participation" and that this issue was not submitted to the jury nor included in the jury instructions.

■ Interstate misinterprets our previous holding. In *Carpenter,* we explained, "It is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner." *Id.* at 394. Here, the following issue was submitted to the jury:

> If [you found that Interstate was a controlling person of Jordan], did Interstate Securities Corporation take adequate precautionary measures to prevent an injury caused by an employee, supervise its employees in an adequate and reasonable fashion, and maintain its system of control in a diligent manner?

This question not only comports with the spirit of *Carpenter,* but tracks the language of the opinion. The jury found that Interstate had failed to adequately supervise Jordan. We find no error in the instruction given to the jury on the question of "culpable participation."

■ Interstate also contends that the district court erred in failing to instruct the jury concerning the asserted contributory negligence of the investors. Because the verdict against Interstate is based on multiple theories of liability in addition to negligence, the trial court's failure to give this instruction is harmless error.[12]

whose liability was based solely on negligence.

## D. Punitive Damages

■ Interstate next challenges the punitive damages awarded to the investors and Bradley on their common law claims.[13] Interstate contends that Jordan knew he was doing something his employer prohibited and that he hid his actions from his superiors. It asserts that Interstate cannot be held liable for Jordan's fraud because it was committed outside the scope of his employment.[14]

■ In North Carolina, "a master is liable for punitive damages awarded when the servant or agent causing the injury was acting in the course and scope of the master's business." *Mazza v. Medical Mut. Ins. Co.*, 311 N.C. 621, 627, 319 S.E.2d 217, 221 (1984), *citing Hairston v. Atlantic Greyhound Corp.*, 220 N.C. 642, 645, 18 S.E.2d 166, 168 (1942); *see also Jones v. Gwynne*, 312 N.C. 393, 409, 323 S.E.2d 9, 18 (1984); E. Hightower, *North Carolina Law of Damages* § 4-2 (1981). The scope of an agent's authority

> includes not only the acts done within the agent's actual authority, but also those done within his "apparent authority." An agent's apparent authority is that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses, and which the principal is estopped to deny. It has also been de-

scribed as the power the third person who dealt with the agent had a right to infer that he possessed, from his own acts and those of his principal.

*McGarity v. Craighill, Rendleman, Ingle & Blythe, P.A.*, 83 N.C.App. 106, 109, 349 S.E.2d 311, 313 (1986) (citations omitted), *rev. denied*, 319 N.C. 105, 353 S.E.2d 112 (1987). "[T]he nature and extent of an agent's authority is a question of fact to be determined by the trier of fact." *Foote & Davies, Inc. v. Arnold Craven, Inc.*, 72 N.C.App. 591, 595, 324 S.E.2d 889, 893 (1985).

■ Here, the jury received evidence that Jordan met Dawson Realty investors at his Interstate office and introduced them to Interstate personnel, that he received a stream of Dawson correspondence at Interstate, and that he transferred money to Dawson from an Interstate account. The jury returned specific findings that Jordan had defrauded the investors and that his conduct was within the scope of his apparent authority as an Interstate employee and "of the same general nature as that authorized . . ., or incidental to the conduct authorized" by Interstate.[15] Under the principle of respondeat superior as applied in North Carolina, these findings support the district court judgment that Interstate is jointly and severally liable for the punitive damages awarded against Jordan.

**13.** Punitive damages are not available under the investors' federal and North Carolina securities claims. *See Carras v. Burns*, 516 F.2d 251, 259–60 (4th Cir.1975) (punitive damages foreclosed in a Rule 10b–5 action by Securities Exchange Act of 1934 § 28(a), codified at 15 U.S.C. § 78bb(a)); *Hill York Corp. v. American Int'l Franchises*, 448 F.2d 680, 697 (5th Cir.1971) (punitive damages not available in action under § 12 of 1933 Securities Act); N.C.Gen.Stat. § 78A–56(a)(2) (punitive damages not included in relief available under state securities act).

However, the investors may recover punitive damages in their pendent common law claims. See *Grogan v. Garner*, 806 F.2d 829, 838 (8th Cir.1986), and cases cited therein. *See also Baker v. Wheat First Sec.*, 643 F.Supp. 1420, 1427 (S.D.W.Va.1986); *cf. Walker v. Action Indus.*, 802 F.2d 703, 711 & n. 16 (4th Cir.1986) (claim for punitive damages properly disallowed when common law claim dismissed), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987).

**14.** Interstate focuses solely on the principal of *respondeat superior* in challenging the district

court's award of punitive damages. However, awards of $80,000 in punitive damages to Hunt and Ramsey and $80,000 to Manual Woodworkers are supported by another basis, independent of *respondeat superior*—the jury's special finding that Interstate breached its fiduciary duty to the investors. *See Stone v. Martin*, 85 N.C.App. 410, 418, 355 S.E.2d 255, 259–60, *rev. den., appeal dismissed*, 320 N.C. 638, 360 S.E.2d 105 (1987) (punitive damages available for breach of fiduciary duty).

**15.** Under North Carolina law, a finding of fraud is sufficient to support an award of punitive damages, *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 113–14, 229 S.E.2d 297, 302 (1976), and an employer is liable for an agent's fraud when committed within the scope of the agent's apparent authority, "even though the principal did not know or authorize the commission of the fraudulent acts." *Norburn v. Mackie*, 262 N.C. 16, 23, 136 S.E.2d 279, 284–85 (1964).

### E. Attorney Fees

■ Interstate also urges that the trial court erred in holding it jointly and severally liable with Jordan for the investors' attorney fees. We find no error. The North Carolina Securities Act specifically provides that plaintiffs may recover attorney fees. N.C.Gen.Stat. § 78A–56(a)(2). The statute also explains when a controlling person may be held liable:

> Every person who directly or indirectly controls a person liable under subsection (a) or (b) ... [is] liable jointly and severally with and to the same extent as such person, *unless the person who is so liable sustains the burden of proof* that he did not know, and did not act in reckless disregard, of the existence of the facts by reason of which the liability is alleged to exist.

N.C.Gen.Stat. § 78A–56(c) (emphasis added).

Interstate repeats its argument that it owed no duty to the investors and therefore was not a controlling person. We have already disposed of this contention. Alternatively, Interstate urges that it sustained the burden of proving that it did not know "of the existence of the facts by reason of which the liability is alleged to exist." In taking this position, Interstate relies on a statutorily created affirmative defense for which it bore the burden of proof. But Interstate never pleaded this defense; it never submitted the issue for inclusion on the prolix special verdict forms used at trial; it never requested a relevant jury instruction. Interstate cannot invoke the defense now. *See Walker v. Action Indus.,* 802 F.2d 703, 710–11 (4th Cir.1986),

*cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987).

### IV. *Issues Raised by Miller*

■ While the judgment against Interstate was grounded on several alternate theories of liability, that against Miller was based solely on negligence. Miller submits that this judgment cannot stand because the trial court failed to instruct the jury concerning his defense—the alleged contributory negligence of the investors. We agree that the district court erred in omitting this instruction and therefore reverse and remand for a new trial as to Miller.

■ Contributory negligence is a defense to professional negligence under North Carolina law. *See United Leasing Corp. v. Miller,* 60 N.C.App. 40, 44–54, 298 S.E.2d 409, 412–18 (1982), *rev. den.,* 308 N.C. 194, 302 S.E.2d 248 (1983).[16] As the North Carolina Supreme Court has explained:

> A defendant ... is entitled to have any evidence tending to establish contributory negligence considered in the light most favorable to him and, if diverse inferences can reasonably be drawn from it, the evidence must be submitted to the jury with appropriate instructions as to its bearing on the issue.

*Atkins v. Moye,* 277 N.C. 179, 184, 176 S.E.2d 789, 793 (1970); *see also Radford v. Norris,* 74 N.C.App. 87, 88–89, 327 S.E.2d 620, 621–22, *rev. den.,* 314 N.C. 117, 332 S.E.2d 483 (1985).

Miller asserts that the investors failed to make a reasonable inquiry into the particulars of the investment, to request basic

---

**16.** The investors assert that *United Leasing* should be distinguished on its facts. However, nothing in *United Leasing* suggested that the North Carolina Court of Appeals intended to restrict to the facts of that case the availability of a contributory negligence defense to a charge of professional negligence. Subsequent North Carolina decisions have made it clear that an attorney may raise his client's negligence as a defense to an action for professional negligence. *See, e.g., Rorrer v. Cooke,* 313 N.C. 338, 355, 329 S.E.2d 355, 366 (1985); *Cheek v. Poole,* 98 N.C. App. 158, 390 S.E.2d 455, 460 (1990).

Moreover, the facts of *United Leasing* parallel many aspects of the case at bar. In *United*

*Leasing,* United alleged that an attorney hired to conduct a title search had negligently failed to discover a lien. The state court explained, it was "[t]he circumstances of receipt of this information" which imposed on United "a duty to make a reasonable inquiry." 60 N.C.App. at 53, 298 S.E.2d at 417. In the present case, Miller urges that the circumstances surrounding the Dawson Realty transactions should have alerted the investors "to make a reasonable inquiry" and that any injury flowed from their failure to inquire. This argument parallels the analysis of the North Carolina court in *United Leasing.*

transactional documents, and to examine the documents they were given. Considering the record in the light most favorable to Miller, we think the evidence could reasonably support an inference of contributory negligence. Miller was entitled to an appropriate instruction. In its absence, he is entitled to a new trial.[17]

### V. Conclusion

To summarize, we affirm the judgment against Interstate. However, we reverse the judgment against Miller and remand for a new trial.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

**17.** Miller's argument that he was entitled to a directed verdict as to Hunt and Ramsey's claims is without merit. In light of our decision to remand, we do not reach Miller's other assertions of error.