## C. Mitchell ANDREWS, et al.

### v.

## Robert E. FITZGERALD, Jr., et al.

### No. C–89–649–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

June 7, 1993.

---

Arthur A. Vreeland, Kenneth L. Jones, Lisa J. Reed, Greensboro, NC, for plaintiffs.

House & Blanco, PA, Steve M. Pharr, William F. Maready, Urs R. Gsteiger, Winston–Salem, NC, Adams, Kleemeirer, Hagan, Hannah & Fouts, Greensboro, NC, for defendants.

Lawrence Culler, pro se.

John E. Adams, pro se.

## MEMORANDUM OPINION

TILLEY, District Judge.

C. Mitchell Andrews, *et al.*, Plaintiffs (referred to collectively as "Andrews"), filed a complaint against Robert E. Fitzgerald, *et al.*, Defendants (collectively referred to as "Fitzgerald") alleging violations of three federal statutes—the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*; § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*; and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, which was promulgated thereunder. In addition, Plaintiffs' complaint alleges several state law claims under the North Carolina Securities Act, the Florida Securities and Investor Protection Act, and additional claims under North Carolina law, including actual fraud, constructive fraud, negligent misrepresentation, and unfair and deceptive trade practices.

Two groups of defendants have filed dispositive motions which are now ripe for review. Defendants Robert E. Fitzgerald, Jr., Thomas E. Barrier, Quinter Inc., Lexington Financial Corp., and Cavalier Management Co., Inc. (collectively referred to as "Fitzgerald" or "Fitzgerald defendants") have filed a motion for summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure. A second group of defendants, Oren J.

Heffner and Kensington Park West Investment Corporation ("Heffner" and "KPWIC"), have filed a motion to dismiss under Rule 12(b)(6), or in the alternative, a motion for summary judgment under Rule 56(b).

The Court has carefully considered the arguments by the parties under the standard for summary judgment. For the reasons hereafter stated, Defendants' motions will be GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

This litigation arises out of Plaintiffs' investments, and subsequent losses, in a limited partnership known as the Kensington Park West Associates ("KPWA," the "Partnership", or "Project"). A brief overview of the parties involved and structure of the Partnership will be discussed below. Because of the complexity of this case, additional facts will be set forth as necessary.

KPWA, a North Carolina limited partnership, was formed by Defendants in 1985 to acquire an apartment complex in Raleigh, convert the apartments to condominiums, and sell the condominiums as tax shelter investments. The Partnership was structured as follows: Berne Corporation served as the managing general partner (35% interest), Kensington Park West *Investment Corporation* ("KPWIC") was a general partner (15% interest), and each of the plaintiffs was a limited partner (50% interest). Berne Corporation, like defendants Quinter Corporation and Lexington Financial Corporation, was controlled by Fitzgerald who served as President of each corporation and owned a majority of each corporation's stock during the times relevant to this lawsuit. These three corporations controlled by Fitzgerald were often collectively referred to as the Quinter Financial Group, although there was never any formal organization between them.[1] Defendants Barrier and Culler acted as Vice Presidents of the corporations. Defendants Oren Heffner, John Adams, and

Gaither S. Walser served as the sole officers, directors, and shareholders of the general partner KPWIC.

One hundred limited partner investment units in the Partnership were offered to a restricted number of qualified investors, including the plaintiffs. A qualified investor was one who met certain investor suitability standards, such as having a sufficient networth, having adequate taxable income to realize the full economic benefit of any tax losses in the Project, and having the sophistication and experience necessary to appreciate the risky nature of the investment. (Confidential Offering Memorandum, p. 1–2). Participation in the Partnership was offered to investors through a written Confidential Offering Memorandum (COM). The securities were not registered under federal or state securities laws, but were issued in reliance upon exemption from such registration. The investors in the Partnership were residents of the states of Florida and North Carolina.

Each investment unit consisted of (1) a $1,500.00 equity investment in the Partnership, and (2) a loan to the Partnership totalling $40,000.00. Under the terms of the Partnership Agreement and offering materials, the loan could be made in either one lump sum at closing (December 30, 1985), or in installments ($15,000.00 on December 30, 1985; $7,500.00 on November 1, 1986; $7,500.00 on November 1, 1987; and $10,000.00 on November 1, 1988). Investors choosing the installment method were required to sign a non-interest-bearing Promissory Note promising to pay the remaining $25,000.00 in post-closing loan installments to the Partnership. In addition, such investors had to provide a letter of credit acceptable to Lexington Savings Bank securing the payment of such installments. In return for the $40,000.00 loan to the Partnership, each investor-plaintiff received an interest-bearing Promissory Note from the Partnership, guaranteed by Berne Corporation (the managing partner).[2]

---

1. A fourth corporation, defendant Cavalier Management Company, Inc., was formed after the formation of the Partnership in 1986 in order to provide management services for the real estate

projects owned by the Quinter Financial Group, including KPWA.

2. The loans to the Partnership were repayable by monthly installments of interest only, with the

In addition to making an equity contribution and loans to the Partnership, each of the plaintiff-investors was required to purchase a package of three or four condominiums in the Project per limited partner unit. (Partnership Agreement, p. 7.) (COM, p. 10.) This condominium purchase requirement provided the tax shelter component to Plaintiffs' investments in the Partnership. The limited partners could purchase the condominiums for a down payment of $100.00 per condominium unit upon execution of a standard form condominium unit purchase contract (Purchase Contract). The contract provided financing of the purchase with a 30–year amortization schedule, monthly payments to the Partnership, and an option for the Partnership to call for payment of the outstanding balance of the purchase price 30 days prior to the seventh anniversary of the closing date. The sales of the condominium units to the limited partners were without recourse, meaning that a purchaser could stop paying on his purchase contract at any time without incurring liability to the Partnership. Furthermore, a limited partner could sell his condominium units at any time. (COM, p. 5).

The Partnership Agreement provided that a limited partner could withdraw from the Partnership *at any time.* In such a case, the limited partner would receive back her $1,500.00 capital contribution, and, if she chose the installment loan option, would be relieved of her obligation to make any further loan payments to the Partnership under the Installment Note. Furthermore, each limited partner granted to the Partnership an option to reacquire her interest in the limited partnership under certain conditions. Under the terms of the option, if the Partnership reacquired any of the condominium units from the limited partner at any time (due to a default under the Purchase Contract or otherwise), then the Partnership would have 30 days to purchase the limited partner's interest by paying the limited partner her $1,500.00 capital contribution. In such a reacquisition, a limited partner who had chosen the installment loan option would also be relieved from making any further installments under the Installment Note.

Generally, the condominium units were rented to the public. The rents from these units were pooled, and the owners were then credited with rentals received based upon occupancy levels. Each month, the general partners mailed several items to the investor-plaintiffs. First, they mailed a "cash flow statement" which described the Partnership's cash flow for the previous month. Second, they supplied a monthly reminder notice, which set forth the amount of "deficit payment" needed to be paid by the condominium owner to cover the costs of operations *not* covered by the rents received. Third, they sent a check from the Partnership representing the interest payment on the Promissory Notes given by the Partnership at closing. Fourth, if possible, they mailed a check from the Partnership representing each limited partner's pro rata distribution of "excess" cash not needed by the Partnership. Any profits realized by the Partnership were to be split 50% to the general partners (the defendants) and 50% to the limited partners (the plaintiffs). Less frequently, usually on a quarterly basis, each investor also received a newsletter from the Partnership describing in general terms the operational results of the Partnership.

The limited partnership was formed and the apartment complex was acquired by the Partnership and converted to condominiums December 30, 1985. Several problems soon developed in the operation of the Partnership, including a low occupancy rate at the complex worsened by an oversupply of apartment housing and the generally poor real estate market in Raleigh. Furthermore, Congress passed the Tax Reform Act of 1986 which limited (ultimately eliminating) the tax-shelter benefits of passive real estate investments, thus drastically reducing the attractiveness of plaintiffs' investments.[3] Several investors abrogated their condominium purchase contracts, without recourse from the Partnership. After the Partnership failed to meet its debt obligations, several

principle amount to be repaid on the seventh anniversary.

3. *See* I.R.C. §§ 469($l$)(1), 469($l$)(3)(B).

investors declared their Promissory Notes from the Partnership to be in default and brought a successful action against the Partnership and Berne Corporation (the Guarantor) in state court. After several attempts at refinancing, a voluntary petition in bankruptcy was filed on the Partnership's behalf on November 15, 1988 in the United States Bankruptcy Court for the Eastern District of North Carolina. This complaint by Plaintiffs was filed on September 29, 1989.

## II. ANALYSIS

To be successful on a motion for summary judgment, the movant must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must draw all justifiable inferences in favor of the non-moving party and against the moving party because "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Because the standard for considering a motion for summary judgment mirrors the standard for what has traditionally been known as a "directed verdict,"[4] the standard can also be expressed as follows: "whether, viewing the evidence in the light most favorable to the non-moving party and giving him the benefit of all reasonable inferences, there is sufficient evidence in the record to support a jury verdict in his favor." *Herold v. Hajoca Corp.,* 864 F.2d 317 (4th Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989).

The Fitzgerald defendants and defendants Heffner/KPWIC have moved for summary judgment on each of the claims raised by Plaintiffs. Each claim will be discussed in the following order: (A) federal securities claims; (B) civil RICO claims; (C) claims under North Carolina law; (D) Florida securities claims; and (E) special defenses submitted by defendant Heffner. The analysis, unless specially noted to apply only to defen-

dant Heffner or KPWIC, will apply to all Defendants.

## A. FEDERAL SECURITIES CLAIMS

### 1. *The Statute of Limitations*

#### a. Section 10(b)

Defendants first contest the timeliness of plaintiffs' claim for relief under section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. Defendants argue that Plaintiffs' cause of action is barred by the one-year/three-year rule established in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

In *Lampf,* the Supreme Court announced that actions under section 10(b) must be brought within one year after the discovery of facts constituting a violation of the securities laws, and in no event later than three years after such violation. The three-year period functions as a statue of repose, barring all claims regardless of discovery if the claim is filed more than three years after the sale occurred. Furthermore, the *Lampf* court held that its ruling would be applied not only *prospectively* to new actions brought after the decision was entered, but also *retroactively* to all civil actions then pending. In response to the retroactive nature of the *Lampf* decision, Congress passed the FDIC Improvement Act of 1991, § 476, which became § 27A of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa–1) ("The FDIC Act" or "§ 27A"). Defendants argue that § 27A of the FDIC Act is unconstitutional in that it violates the separation of powers, due process, and equal protection clauses of the Constitution. Plaintiffs, on the other hand, argue that the FDIC Act is constitutional; thus their securities claim is not time barred by the rule announced in *Lampf.*

The first question to resolve is the constitutional status of § 27A of the FDIC Act. That section in relevant part reads as follows:

> Sec. 27A. (a) *Effect on Pending Causes of Action*—The limitation period for any private civil action implied under section

---

4. The concept is now termed as "judgment as a matter of law." *See* Fed.R.Civ.P. 50(a).

10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

(b) ....

It is clear that § 27A was passed to counteract the retroactive application of the uniform one-year/three-year limitations rule announced in *Lampf.* In this case, Plaintiffs' claim was filed before June 19, 1991; thus, if constitutional, § 27A mandates the Court to apply the statute of limitations and retroactivity rules that existed prior to the *Lampf* decision.

This Court holds that § 27A of the FDIC Act was a constitutional act of Congress. Several courts have considered and rejected the arguments submitted by Defendants. *See, e.g., Anixter v. Home–Stake Production Co.,* 977 F.2d 1533 (10th Cir.1992), *cert. denied sub. nom. Dennler v. Trippett,* — U.S. ——, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993); *Henderson v. Scientific–Atlanta, Inc.,* 971 F.2d 1567 (11th Cir.1992); *Venturtech II v. Deloitte, Haskins & Sells,* 790 F.Supp. 574 (E.D.N.C.1992), *aff'd* 993 F.2d 228 (4th Cir. 1993). *See generally,* T.L. Hazen, *The Law of Securities Regulation,* § 13.8 & n. 38.75 (1993 Supp.) (noting that most cases considering § 27A have concluded that the provision is constitutional).

▉ Section 27A does not violate the separation of powers doctrine because that section does not direct a particular finding of fact or decision on the merits. Congress performed within its realm of power—it disagreed with the Supreme Court's interpretation of the Securities Exchange Act of 1934; thus, Congress amended the statute. Congress changed the underlying law by preserving the statute of limitations applicable to Rule 10b–5 claims filed prior to the *Lampf* decision. In changing the underlying law, Congress did not cross the constitutional line as established in *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872) (Congress cannot apply a particular rule of decision to a discrete, identifiable group of cases without either amending or repealing the law underlying that litigation). *Scienti-*

*fic–Atlanta,* 971 F.2d at 1571–73. Furthermore, § 27A does not violate Defendants' rights to due process and equal protection guaranteed by the Fifth Amendment. This Court disagrees with Defendant Heffner/KPWIC's view that the FDIC Act "is not supported by any legitimate legislative purpose." To the contrary, the FDIC Act "is a rational means of preserving those lawsuits which were pending prior to *Lampf." Scientific–Atlanta,* 971 F.2d at 1574. Likewise, because § 27A does not affect a fundamental right or a suspect classification, and is rationally related to a reasonable legislative objective, there is no equal protection violation. *Id.* at 1574; *Venturtech II,* 790 F.Supp. at 576.

Finding § 27A of the FDIC Act to be constitutional, the second issue to resolve is the appropriate statute of limitations. Section 27A directs the Court to apply the law of this jurisdiction as it existed on June 19, 1991. Defendants argue that several pre-*Lampf* Supreme Court cases, the latest being *Agency Holding Corp. v. Malley–Duff Assoc., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (RICO claim), established that the one-year/three-year limitations period was the appropriate one in the Fourth Circuit. *See also, DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (same, Labor Relations Management Act); *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (same, § 1983 civil rights violation). The *Agency Holding* line of cases hold that lower federal courts should first look to federal law in borrowing a statute of limitation if there existed an analogous express cause of action with an express statute of limitation in the statute of origin. Defendants argue that *Lampf* was merely a "finding" of the law and did not change the law in this jurisdiction.

Defendant's argument is rejected because it ignores the precedent of the Fourth Circuit. The cases of *O'Hara v. Kovens,* 625 F.2d 15 (4th Cir.1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) and *Gurley v. Documation, Inc.,* 674 F.2d 253 (4th Cir.1982) established that the timeliness of a civil action under section 10(b) was

determined by reference to the state statute of limitations that "most clearly addresses the same or similar policy considerations as are addressed by the federal right being asserted." *Gurley*, 674 F.2d at 258. As of June 19, 1991, lawyers could rely on *O'Hara* and *Gurley* for establishing the statute of limitations in federal securities cases under section 10(b) because neither case had been limited or overruled. Indeed, Defendants cite no case from this jurisdiction establishing a one-year/three year rule in federal securities claims under section 10(b). Furthermore, even though some circuits had adopted the one-year/three-year rule prior to *Lampf, e.g., In re Data Access Systems Sec. Litig.*, 843 F.2d 1537 (3rd Cir.) (*en banc*), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), other circuits, like the Fourth Circuit, continued the accepted practice of borrowing the statute of limitations from the most analogous state law. *See e.g., Howard v. Haddad*, 962 F.2d 328, 330 n. 3 (4th Cir.1992); *Nesbit v. McNeil*, 896 F.2d 380, 384 (9th Cir.1990); *Smith v. Duff and Phelps, Inc.*, 891 F.2d 1567, 1569–70 (11th Cir.1990).

■ The rule of law announced in *Gurley* and *O'Hara* was thus controlling in the Fourth Circuit on June 19, 1991. These decisions direct the Court to North Carolina's Blue Sky statute of limitations, N.C.Gen.Stat. § 78A–56(f), which is the most analogous state statute of limitations. That statute provides, "No person may sue under this section [§ 78A–56 civil liabilities] more than two years after the sale or contract of sale." [5] Plaintiffs signed their subscription agreement with the Partnership on December 30, 1985. This lawsuit was filed September 29, 1989, more than two years after Plaintiffs entered into the Partnership. Thus, on the face of Plaintiffs' complaint, both their section 10(b) and corresponding North Carolina securities claims are time-barred.[6]

Plaintiffs submit two arguments in support of the timeliness of their securities claims. First, they contend that the statute of limitations was tolled as a result of the fraud perpetuated by Defendants. Second, they urge that even if the statute of limitations was not tolled by Defendants' alleged fraud, Plaintiffs' claims are not barred in their entirety due to the investment decision doctrine.

■ The time provision in N.C.Gen.Stat. § 78A–56(f) is a statute of limitations, subject to equitable principles, rather than a statute of repose. *Walker v. Montclaire Housing Partners*, 736 F.Supp. 1358 (M.D.N.C.1990). In borrowing the state statute of limitations, the Court also looks to state tolling doctrines. *O'Hara*, 625 F.2d at 19. However, while state law determines the applicable statute of limitations, federal law determines *when* the period of limitations begins to run. The Fourth Circuit has held that the statute of limitations for securities fraud begins to run when "the fraud is either actually known or should have been discovered by the exercise of due diligence." *Newman v. Prior*, 518 F.2d 97, 100 (4th Cir.1975), *overruled on other grounds, Newcome v. Esrey*, 862 F.2d 1099 (4th Cir.1980) (en banc). *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993) explained that the limitations period commences when the plaintiffs are on "inquiry notice" of the fraud. When the underlying facts are not in dispute, the point at which a plaintiff has been put on inquiry notice can be decided as a matter of law. *Id.* The court stated that "inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Id.* The court further noted that a party, once on inquiry notice, must act with due diligence to discover the alleged fraud. *Id.*

Thus, the two-year limitations period for Plaintiffs' section 10(b) claim did not begin to run until Plaintiffs discovered, or reasonably should have discovered, the alleged fraud

---

**5.** The Court rejects Plaintiffs' argument that the more generous three-year statute of limitations for general fraud should apply as in *Pasquotank County v. American Surety Co.*, 201 N.C. 325, 160 S.E. 176 (1931). North Carolina's Blue Sky statute was passed after *Pasquotank* and provides a more specific statute of limitations for the particular offense of securities fraud.

**6.** For a discussion of the North Carolina securities claim, see section II.C.4. of this memorandum opinion.

based on principles of inquiry notice. In paragraph 112 of their complaint, Plaintiffs allege that they exercised due diligence and filed their complaint shortly after discovering Defendants' allegedly fraudulent acts. Defendants argue that Plaintiffs were put on inquiry notice from the cautionary language contained in the COM, just as were the investors in the *Brumbaugh* case. Comparing Plaintiffs' allegations of fraud with the warnings found in the COM, the Court concludes that the warnings did put Plaintiffs on inquiry notice as to some of their claims, but not as to others.

■ Paragraphs 96, 97, and 106–108 of the complaint set out Plaintiffs' numerous allegations of misrepresentations in the COM, of intentionally concealed facts, and of false post-offering communications. Defendants have distilled the allegations of wrongdoing into four basic categories:

(1) Defendants told plaintiffs Berne Corporation had a net worth of $580,000.000, when it did not in fact;

(2) Defendants falsely made it appear in the COM that the assets of the Quinter Financial Group were at risk or available to support the operations of the partnership project;

(3) Defendants knowingly included financial projections and a property appraisal in the COM which were based upon unrealistic or inapplicable assumptions; and

(4) Defendants failed to disclose their intention to implement a plan or scheme to conceal poor operating results of the partnership project from the investors to keep them from abandoning their interests and refusing to make their loan advances or condominium payments.

Fitzgerald Defendants' Brief in Support of Motion for Summary Judgment, p. 29. The cautionary language within the COM primarily focuses on issues raised in the third category—the financial projections of the Project. For example, the preface to the COM prominently states:

FINANCIAL PROJECTIONS AND TEXTUAL DISCUSSION OF FUTURE TAX AND OTHER RESULTS CONTAINED IN THIS MEMORANDUM AND EXHIBITS ARE BASED ON ASSUMPTIONS WHICH MAY NOT PROVE TO BE ACCURATE.

At pages 10–11, the COM discusses the appraisal of the apartment complex converted to condominiums. After introducing the appraiser, the COM states:

The aggregate proposed sales price for the apartments as condominiums is $10,988,-200.00 greater than the purchase price which the Partnership will pay for the Project. This differential reflects, among other things, the conversion of the rental apartments into condominiums and their value as separate condominium units. No assurance can be given that the Partnership will be successful in converting the apartments into condominiums.

Warnings about the results of the financial projections, as well as the assumptions underlying the financial projections, are repeated several more times in the COM. These warnings were sufficient to put Plaintiffs on inquiry notice regarding any claims of fraud arising out of the financial projections or the condominium appraisal. Like the Private Placement Memorandum in *Brumbaugh*, the COM in this case warned Plaintiffs of the very risks and potential problems concerning the financial projections that later materialized and form part of the basis for this suit. *Brumbaugh*, 985 F.2d at 162–63. Thus, Plaintiffs were put on inquiry notice of this claim in December of 1985. Since they did not file this lawsuit until September 29, 1989, the securities fraud claims based on the financial projections and real property appraisal are untimely and Defendants' motions for summary judgment are GRANTED.

The same cannot be said, however, for Plaintiffs' other allegations of fraud. There are simply no warnings in the COM that correspond to Plaintiffs' claims of fraud in categories one, two, and four above. Defendants' arguments that Plaintiffs were on inquiry notice, as well as questions regarding Plaintiffs' due diligence once put on inquiry notice, are questions of fact that cannot be resolved at this point in the litigation. Accordingly, Defendants' motions for summary judgment on the statute of limitations

grounds on those claims of fraud are DE-NIED. *See, Newman*, 518 F.2d at 100 ("When conflicting inferences can be drawn from the facts, the question of when the fraud should have been discovered must be submitted to the jury"); *Stewart v. Germany*, 631 F.Supp. 236, 247–48 (S.D.Miss.1986) (denying summary judgment because the issue of plaintiff's due diligence in discovering fraud created an issue of fact).

Because Plaintiffs' section 10(b) securities claim is subject to the discovery rule of accrual, it is unnecessary to consider the parties' arguments about the investment decision doctrine at this time.[7]

b. Section 12(2)

Unlike section 10(b) of the 1934 Act, a cause of action under section 12(2) of the 1933 Securities Act [8] is governed by an express limitations period in section 13.[9] The statute of limitations is a one-year/three-year rule—a plaintiff must bring her action within one year of discovery of the fraud *and* within three years of the sale of the security. As discussed in the previous section, Plaintiffs should have discovered the alleged fraud in the financial projections and real estate appraisal due to the factual disclosures within the COM in December of 1985. Thus, claims of fraud relating to the financial projections and real estate appraisal are untimely under the one year statute of limitations. As to such claims, Defendants' motion for summary judgment is GRANTED.

The three year rule within the limitations period of section 13 is a statute of repose not subject to equitable tolling. Defendants argue that Plaintiffs' remaining claims under section 12(2) are time barred because the claims were filed September 29, 1989, more than three years from the sale of the securities on December 30, 1985. Plaintiffs concede that any investments that occurred prior to September 29, 1986 are time barred due to the three year statute of repose. Plaintiffs contend, however, that under the investment decision doctrine, numer-ous sales of securities occurred *after* September 28, 1986, and as to those sales their claims are timely.

The investment decision doctrine is triggered when an investor is confronted with periodic contributions in which the investor exercises investment discretion. In appropriate circumstances, the additional contributions are viewed as additional "sales" of securities, thereby establishing a new limitations period. *See, e.g., Goodman v. Epstein*, 582 F.2d 388, 409–14 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). *See generally* Hazen, *The Law of Securities Regulation*, § 7.5.4, p. 343–44 (2nd ed. 1990 and pocket part). Although the Fourth Circuit has not addressed the investment decision doctrine, it has been widely recognized in the federal courts. *Goodman, supra; Ingentio v. Bermec Corp.*, 376 F.Supp. 1154 (S.D.N.Y.1974); *Hill v. Equitable Bank*, 655 F.Supp. 631, 638–40, *aff'd*, 851 F.2d 691 (3rd Cir.1988), *cert. denied sub nom., Data Controls North, Inc. v. Equitable Bank Nat'l Ass'n*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). The central question in determining the applicability of the investment decision doctrine addresses the *options* available to the investor—can the investor, when confronted with future payments, exercise discretion by either "purchasing" new securities or by relieving himself of his obligation to the Partnership altogether? A survey of cases discussing the investment decision doctrine establishes several questions helpful to determining the applicability of the doctrine. Those question are as follows:

1. Did the investors envision an ongoing relationship with management at the time they invested? *Goodman*, 582 F.2d at 412–13.

2. Was the total purchase price collected up front, or did the partnership ask for later capital contributions? Were the later capital contributions called at random times for various amounts, or at set times for specified amounts? *Id.*

---

7. As discussed in the next section, however, Plaintiffs can also avail themselves of the investment decision doctrine.

8. 15 U.S.C. § 77*l*(2).

9. 15 U.S.C. § 77m.

3. If future contributions were contemplated, could a single investor simply walk away from the deal at that later date without being held liable for future amounts? *Hill,* 655 F.Supp. at 638–39.

4. Do the options available to an investor assume ownership of the full partnership interest? *Id.; Stewart v. Germany,* 631 F.Supp. 236, 246 (S.D.Miss.1986); *Bermec,* 376 F.Supp. at 1184.

■ The first question favors Plaintiffs because they clearly envisioned an ongoing relationship with the management of the Partnership. The monthly deficit payments as well as the monthly communications from the Partnership demonstrates that the parties contemplated an ongoing relationship with one another.

Second, the future payments inquiry favors Plaintiffs, especially those choosing the installment loan option. After an initial $1,500 capital contribution, the investors then had a choice of loaning the entire $40,000 to the Partnership at one time, or electing the installment method of payment. Only installment method investors confronted a potential investment decision on those future installment dates. A factor that weighs against the installment method plaintiffs, however, is that unlike the plaintiffs in *Goodman, supra* who were confronted with capital calls from the Partnership at unspecified times and for unspecified amounts of money, the plaintiffs here agreed to pay specific amounts of money at specific dates in the future. The monthly condominium payments clearly show that future payments were contemplated by the parties.

The third question hits at the heart of the investment decision doctrine—can an individual partner, when confronted with future contributions, walk away from his investment without incurring future liability to the Partnership? The loans to the Partnership and the condominium purchase payments must be analyzed separately.

Regarding loans to the Partnership, the installment method investors had to provide a letter of credit to a bank securing the remaining $25,000 payment in addition to loaning $15,000 to the Partnership at the time of the closing. This letter of credit, however, did *not* allow the Partnership to collect from the bank (which would, in turn, look to the investor) in the event an investor did not pay his installment. Thus, if an installment method investor decided not to invest further money in the Partnership, he could refuse to forward the money without recourse from the Partnership. *Contrast, Hill,* 655 F.Supp. at 638 (payments were secured by irrevocable letters of credit such that "if plaintiff defaulted on a payment, the partnership could turn to the bank for payment, and the limited partner may be personally liable to the bank"). This factor weighs heavily in favor of the installment method investors for those amounts loaned to the Partnership during the installment dates.

The monthly payments for the condominium purchases by the plaintiff-investors were also without recourse, meaning that ultimately, plaintiff-investors were not liable for future amounts due under the contracts. If an investor failed to make a payment on her condominium, she would (1) lose her right to acquire the condominiums; (2) forfeit all payments made under the contact to date; (3) risk reacquisition of her limited partnership interest by the Partnership;[10] and (4) bear any tax consequences. Plaintiffs argue that these consequences highlight the investment decision available to them every month. In addition to walking away from the monthly condominium payments without incurring future liability to the Partnership, Plaintiffs also had the option of selling their interests in the condominiums. These investment options available to Plaintiffs weigh in favor of applying the investment decision doctrine to the monthly condominium payments.

A fourth issue that courts have considered is whether options available to the investor assume ownership of the full partnership in-

10. Paragraph 3.4(b) of the Limited Partnership Agreement stated that the limited partners granted to the Partnership an option to reacquire limited partnership interests in the event the Partnership "for any reason reacquires any or all

of the condominium units purchased by such Limited Partner ... (due to a default under the Condominium Contract by the Limited Partner or any subsequent transferee of the Condominium Contract, or otherwise)...."

terest. If so, courts are less likely to apply the investment decision doctrine. *See, e.g., Hill*, 655 F.Supp. at 639–40; *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154 (S.D.N.Y.1974). In *Bermec*, the court drew a distinction between payments on a "maintenance contract," which were subject to the investment decision doctrine, and payments on a "promissory note," which were not. The plaintiffs in *Bermec* purchased cattle for which they received a certificate of title for each animal, and entered into maintenance contracts for the care of the animals. They financed the purchase of cattle by making a down payment and executing promissory notes. The court reasoned that payments on the maintenance contract, which contained a cancellation clause, constituted an investment decision because "[e]ach payment involved additional investment in the investment contracts, in the hope of increasing the investor's equity in the form of healthier, larger, stronger cattle and additional progeny." *Id.* at 1184. Using the same reasoning, the court held that payments on the promissory notes did not constitute separate investment decisions, because the parties rights and obligations were fixed at the time of making the note. The court reasoned that plaintiffs "already had title to the cattle at the point of the underlying sale, and except in a purely technical sense, acquired nothing additional by their payment; and, second, their obligation to pay was fixed and non-cancelable." *Id.*

In this case, the condominium purchase agreements cannot be easily categorized as either promissory notes or maintenance contracts as in *Bermec*. To join the Partnership, Plaintiffs were required to purchase at least one unit of condominiums. Factors supporting the conclusion that the condominium payments were more similar to the promissory notes in *Bermec* are that (1) full ownership in the condominium units vested to Plaintiffs as evidenced by their ability to sell the units, and (2) Plaintiffs were able to claim ownership of the units for tax purposes from the start. However, other factors suggest that the payments were closer to the maintenance contracts in *Bermec*. In making monthly payments, Plaintiffs were increasing the value of their investments. Furthermore, like the maintenance contract in *Bermec* which had a cancellation clause, the condominium purchase contract was without recourse. Thus this factor does not strongly favor either Plaintiffs or Defendants.

After careful review of the COM and the Partnership Agreement combined with an analysis of the four questions presented above, the Court holds that the investment decision doctrine is available for those Plaintiffs who chose the installment method for their capital contribution to the Partnership. Furthermore, the investment decision doctrine applies to the monthly payments the investors made towards their condominium purchase installment contracts. This conclusion is bolstered by Plaintiffs' right to withdraw from the Partnership at any time.[11] The ability of an individual investor to withdraw from the Partnership at any time distinguishes this case from others such as *Bermec* and *Hill* in which the plaintiffs had only the right to dissolve or terminate the partnership by *collective* action. *See, e.g., Hill*, 655 F.Supp. at 639.

Because not all Plaintiffs chose the same investment strategy, however, each Plaintiff's claim must be considered separately for timeliness. Plaintiffs who loaned the $40,000.00 to the Partnership up front and who immediately sold their condominium interests, for example, cannot take advantage of the investment decision doctrine and their section 12(2) securities claim is time-barred. As to those Plaintiffs who either chose the installment method or who made monthly condominium payments, their claims are

---

**11.** The Partnership Agreement, paragraph 7.7 governs withdrawal of a limited partner. It provides the following:

Any Limited Partner may withdraw from the Partnership at any time by giving notice of his election to do so to the General Partners as provided in Section 12. A withdrawing Limited Partner will receive back his $1,500 Initial Cash Contribution per Limited Partner Unit and, if he chose to pay his loan to the Partnership in the form of the Installment Loan Option, will be relieved of his obligation to make any loan payments to the Partnership remaining due under his Non–Interest Bearing Installment Note....

timely for those purchases made on or after September 29, 1986.

### 2. Challenge to the Merits of Plaintiffs' Securities Claims

Defendants also challenge the merits of Plaintiffs' section 10(b) and section 12(2) securities claims. Defendants, raising the same objections to both claims, argue that Plaintiffs have not pled fraud with sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons outlined later in this opinion in the section addressing Plaintiffs' common law fraud claims, those objections are rejected for all Defendants except Heffner. *See infra,* section II.C.1.a.

■ Defendants also argue that Plaintiffs have failed to forecast competent evidence of the essential elements of their securities claims. An implied action under rule 10b–5 allows recovery for fraudulent schemes and devices, misstatements and omissions of material facts, and acts and practices that operate as fraud or deceit in the purchase or sale of a security. The essential elements of an implied Rule 10b–5 claim are: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991), quoting *Bruschi v. Brown,* 876 F.2d 1526, 1528 (11th Cir.1989). An express cause of action under section 12(2) remedies material misstatements or omissions in connection with the sale or offer for sale of a security. With the exception of scienter, the elements of an action under section 12(2) of the 1933 Act are the same as those under Rule 10b–5. *Hazen,* § 7.5.

As discussed earlier, Defendants grouped the allegations of wrongdoing into four basic categories. One category, that encompassing alleged fraud in the financial projections and real estate appraisal, has been dismissed pursuant to the statute of limitations. The three categories of alleged wrongdoing remaining in the case are as follows:

(1) Defendants told plaintiffs Berne Corporation had a net worth of $580,000.00, when it did not in fact;

(2) Defendants falsely made it appear in the COM that the assets of the Quinter Financial Group were at risk or available to support the operations of the partnership project; and

(3) Defendants failed to disclose their intention to implement a plan or scheme to conceal poor operating results of the partnership project from the investors to keep them from abandoning their interests and refusing to make their loan advances or condominium payments.

The Court will address Defendants' arguments in order.

#### a. Berne Corporation's Net Worth

■ The COM represented that Berne Corporation, the managing partner and guarantor of plaintiff-investors promissory notes from the Partnership, had a net worth of $580,000 due to a subscription note receivable in that amount. In fact, it is now undisputed that Berne Corporation possessed a subscription note receivable for only $156,000. Defendants argue that this misstatement is not material for several reasons. Plaintiffs counter that it is difficult to imagine any more material and relevant information concerning a guarantor than its net worth. The legal test for materiality is whether a reasonable investor would consider the matter important in deciding whether to acquire the security given the total mix of information available. *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The materiality of Berne Corporation's net worth is a factual issue which must be resolved at trial. Thus Defendants' motion for summary judgment on this issue is DENIED.

#### b. Availability of Quinter Financial Group's Assets

■ The COM listed the holdings and assets of the Quinter Financial Group, of which Berne Corporation was one of several affiliated companies, to be $4,626,823. This information was provided in a section of the COM entitled "Management and Affiliates," which provided background information on both Berne Corporation and the Quinter Fi-

nancial Group. Plaintiffs allege that this statement was misleading because the COM did not state that the Financial Group's assets were not at risk, nor available to support, the Project. Defendants argue that the COM is clear that only Berne Corporation's assets were at risk in the Project and that the "Management and Affiliates" section merely provides background information on Berne Corporation and affiliated companies. Furthermore, Defendants argue that Plaintiffs have not forecast any evidence of scienter.

Defendants' motions for summary judgment are GRANTED on this issue. First, Plaintiffs have failed to respond to Defendants' argument and have not carried their corresponding burden to withstand summary judgment. Second, after reviewing the COM, it is this Court's conclusion that no reasonable juror could find the COM misleading regarding the availability of Quinter Financial Group's assets. While stating that Berne Corporation's assets were at risk, the COM did not state that the Group's assets were at risk. Nor is it reasonable to so infer. The section on "Management and Affiliates" was clearly given as background information regarding Berne Corporation's real estate investment and management experience.

c. Plan or Scheme to Conceal Poor Operating Results

▮ Plaintiffs have alleged that the COM failed to disclose a scheme by Defendants to conceal poor operating results, thereby causing plaintiff-investors to continue making their monthly condominium payments rather than minimizing probable losses by abandoning their investments. Plaintiffs further allege that Defendants "conspired to and did in fact intentionally falsify the monthly payment reminder statements and periodic status reports or 'newsletters' in order to mislead the plaintiffs" as to the Project's operational results.[12] Because of the following undisputed facts, Defendants' motions for summary judgment are DENIED.

The undisputed facts show that every month, plaintiff-investors received a monthly payment reminder for the condominium units, a monthly cash flow statement detailing the receipts and disbursements of the Partnership, and on a less frequent basis, periodic distributions of income from the Partnership and a newsletter with general information of interest to investors. The monthly payment reminder for the condominium units contained a "less rents received" column. From the wording of the "less rents received" column, it appeared to Plaintiffs that the amount in the column corresponded to money received from actual rental of units. The amount of money in the "less rents received" column was subtracted from the overall monthly payments owed to the Partnership to arrive at a monthly deficit payment for each limited partner. The plaintiff-investors chief complaint is that the "less rents received" column was secretly inflated by subsidies from the Partnership so that the investor-plaintiffs were misled into believing that the Partnership was successfully meeting its financial projections.

Defendants respond by pointing to the monthly cash flow statement, which was also mailed monthly to the investors, and which stated the income, expenses, and operating cash flow of the Partnership. Under the "income" heading of the cash flow statement was an entry for "rent subsidy" followed by the amount that the rents were subsidized each month by the Partnership. Defendants argue that this disclosure is enough to show that Defendants did not "secretly" subsidize "rents received" nor mislead investors that the Partnership was, in fact, subsidizing the rents received. Furthermore, Defendants argue, the financial projections attached as exhibit A to the COM stated that funds were being set aside to subsidize rent payments for 1986.

Despite these disclosures, a reasonable juror could find that the monthly deficit statements and cash flow statements were misleading to investors. The monthly deficit statement did not state that the amount in the "rent received" column contained the rent subsidy *in addition to* the actual rent received. Even with the knowledge that the Partnership set aside an amount for rent

12. Complaint, ¶ 106.

subsidies in 1986, it would be extremely difficult for an investor to determine if the monthly cash flow statement containing the rent subsidy figure was alarmingly high or low. No investor could figure out exactly how much his condominium unit was being subsidized. Combined with statements from the Partnership that the Project was only slightly behind on its financial projections, a reasonable juror could determine that the monthly mailings in total were misleading in that they lulled an investor into a false sense of Project success.

### d. Summary of Defendants' Challenge to the Merits of Plaintiffs' Securities Claims

Thus, on the merits of Plaintiffs' federal securities claims, Defendants' motions for summary judgment are GRANTED for those claims pertaining to: (1) the availability of the assets of Quinter Financial Group to support the Project's operations. Defendants' motions for summary judgment are DENIED for: (2) the alleged fraud in the net worth statement of Berne Corporation, and (3) the alleged scheme to conceal poor operating results via the monthly mailings to limited partners.

### B. CIVIL RICO CLAIMS

Defendants argue that Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, should be dismissed for failure to plead the RICO count with sufficient particularity and, alternatively, for failure to point to evidence of a pattern of racketeering activity. Defendants' arguments based on the pleading requirements of rule 9(b) are rejected for the reasons stated in section III.C.1.a. of this memorandum opinion, with the exception of defendant Heffner.

Determining exactly what constitutes threshold conduct amounting to a "pattern of racketeering activity" is more difficult. In *Menasco, Inc. v. Wasserman*, 886

F.2d 681 (4th Cir.1989), the court discussed the "pattern" of racketeering activity requirement under RICO in light of the Supreme Court's pronouncement in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In order to prove the pattern requirement, a plaintiff must show two things—(1) that the racketeering predicates are related and (2) that they amount to or pose a threat of continued criminal activity. *Menasco*, 886 F.2d at 683. That the predicates involved only one "scheme" is not dispositive. The court is to take a "commonsensical, fact-specific approach" to this "continuity plus relationship" test. *Id.* at 684.[13] *Menasco* held that plaintiffs' allegations failed the continuity prong of the pattern requirement because of several factors, including the narrowly directed, single fraudulent goal of defendants and the limited purpose, perpetrator (one person), victims (two people), and time span (one year). The *Menasco* court contrasted the case from that confronted in *H.J. Inc.*, which involved a systematic tax rate hike by several defendants including Northwestern Bell and the Minnesota Public Utilities Commission, affected thousands of Northwestern Bell customers, and spanned six years.

Turning to the facts of this case, Plaintiffs have alleged that the predicate acts underlying the RICO violation are securities fraud, as well as mail and wire fraud as a result of mailing the COM and discussing its contents with investors over the telephone and mailing the allegedly fraudulent monthly deficit statements, cash flow statements, and newsletters. These alleged predicate acts are sufficiently related to one another, thus the pivotal issue is continuity.

The undisputed facts, along with those forecast by Plaintiffs, show the following: The COM was mailed to a limited number of investors in a private offering. Ninety-one individuals invested in the Partnership as limited partners. Defendants' actions were directed to a single fraudulent goal—invest-

---

**13.** In an earlier opinion, the court listed factors helpful to the "pattern" inquiry, which include: (1) the number and variety of predicate acts; (2) the length of time over which they were committed; (3) the number of putative victims; (4) the presence of separate schemes; and (5) the potential for multiple distinct injuries. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir.1988) (pre-*H.J. Inc.*).

ment in one limited partnership. Defendants' actions involved one set of victims— the investors in the limited partnership. The total number of victims was approximately ninety-one. The COM was distributed and discussed with potential investors for a limited amount of time prior to the close of the deal in December, 1985. The monthly mailings lasted three years, beginning in January, 1986, and continuing through 1988.

Under the precedent of *H.J. Inc.* and relevant case law, the allegations in this case indicate that it is in the grey area of the "pattern" requirement. *Compare, Menasco,* 886 F.2d 681 (pattern requirement not met in scheme involving single fraudulent goal, limited in purpose, one perpetrator, two victims, one year); *Parcoil Corp. v. Nowsco Well Service, Ltd.,* 887 F.2d 502 (4th Cir.1989) (continuity requirement not met in one scheme involving 17 falsified reports sent over a four month period); *Myers v. Finkle,* 758 F.Supp. 1102 (E.D.Va.1990) (continuity requirement not met in one scheme involving 15 separate investments; over course of four years; involving three victims; one type of loss—money), *aff'd in part and rev'd in part,* 950 F.2d 165, 169 (4th Cir.1991); *with Akin v. Q–L Investments, Inc.,* 959 F.2d 521 (5th Cir.1992) (pattern requirement sufficiently alleged where scheme lasted twelve years and involved 127 victims in tax-oriented limited partnerships); *Walk v. Baltimore & Ohio R.R.,* 890 F.2d 688 (4th Cir.1989) (pattern requirement sufficiently alleged in a single, close-ended scheme; lasting over ten years; involving representatives of putative class of minority share holders); *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988) (a pre-*H.J., Inc.* case, court assumed a pattern where scheme lasted more than three years, involved more than 22,000 putative victims, and was *not* limited in scope to the accomplishment of a single discrete objective). Because this case is such a close one, and because the parties will not be put to a greater expense as the elements in the RICO claim largely overlap with the elements of the securities fraud claims, the Court DEFERS ruling on Defendants' motions for summary judgment at this time. In the meantime, significant case law may develop and move the facts of this case from the margins toward the center.

## C. CLAIMS UNDER NORTH CAROLINA LAW

■ Because Plaintiffs' federal securities and state law claims "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court will exercise its supplemental (formerly "pendant") jurisdiction over Plaintiffs' state law claims. Furthermore, considerations of fairness to the litigants and judicial economy support the invocation of the Court's supplemental jurisdiction.

### 1. *Actual Fraud*

Plaintiffs' complaint alleges actual fraud and conspiracy to commit fraud. In addition to challenging the particularity with which Plaintiffs have pled fraud under Rule 9(b), Defendants also argue that Plaintiffs have failed to adduce evidence of the essential elements of the fraud.

#### a. Pleading Fraud

■ All Defendants challenge the sufficiency of Plaintiffs' pleading of fraud, in both the state and federal claims, under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purpose behind the specificity requirement of Rule 9(b) is to give defendants sufficient notice of the particular misconduct alleged to constitute fraud so that they can adequately prepare for defense. *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). To that end, "where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Di Vittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2nd Cir.1987).

■ In cases involving allegations of corporate or partnership fraud, however, the strictures of Rule 9(b) are somewhat relaxed in that plaintiffs are not required to allege

specific connections between fraudulent representations in an offering memorandum or other document originating from the company and particular defendants so long as the defendants are insiders or affiliates participating in the offer of the securities in question. *Id.; Luce v. Edelstein*, 802 F.2d 49, 55 (2nd Cir.1986). *See also, Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987) (in corporate fraud cases, it is reasonable to presume collective action of officers who had direct involvement in corporation's day-to-day affairs in "group published" information such as prospectuses, annual reports, press releases and the like). Even under this relaxed pleading standard, however, plaintiffs must assert more than a mere allegation of insider or affiliate status. *Morin v. Trupin*, 747 F.Supp. 1051, 1061 (S.D.N.Y.1990). Plaintiffs must allege facts of day-to-day involvement in the affairs of the partnership, *Wool v. Tandem Computers Inc.*, *supra*, or facts that provide a "tie in" between the defendant and the partnership documents such as to "give rise to an inference of knowledge, intent, or reckless disregard." *Morin*, 747 F.Supp. at 1061.

▄▄ Under the above standard, Plaintiffs have pled fraud with sufficient particularity to withstand dismissal under Rule 9(b) for all Defendants except Heffner. Paragraphs 96 and 97 contain numerous specific allegations of material misrepresentation and omission of facts from the COM. These two paragraphs adequately identify the specific misrepresentations and the circumstances of the alleged fraud. For example, paragraph 96(f) states:

> The defendants Fitzgerald, Barrier, Culler, Walser, Adams and Heffner, acting in conspiracy with one another and on behalf of, and as agents of, Berne and defendants Quinter, KPWIC and LFC [Lexington Financial Corporation] made the following material misrepresentations through the COM to the plaintiffs:
>
> (f) they represented that "Berne Corporation and Kensington Park West In-

vestment Corp., the general partners of the Partnership, have an aggregate net worth, apart from their interests in the Partnership and in other partnerships, of at least $580,000.00", when in fact they knew or should have known that the general partners had a zero or a negative net worth.

This allegation is much different than the conclusory allegations of fraud in *Luce v. Edelstein*, 802 F.2d 49 (2nd Cir.1986).[14] Furthermore, Plaintiffs have sufficiently pled facts of insider status and day-to-day involvement as to the Fitzgerald defendants so that Plaintiffs can take advantage of the relaxed pleading requirement outlined in *Wool* and *Luce, supra*. For example, Plaintiffs have alleged in paragraph 84 of the complaint that defendant Fitzgerald served as President and Director of Berne Corporation, and, in paragraph 89 of the complaint, that Berne Corporation served as the managing general partner of the Partnership.

Defendant Heffner and KPWIC object that Plaintiffs' pleadings do not support the inference that they were insiders or affiliates of the Partnership. While the mere allegation of insider or affiliate status is insufficient to link an individual to misrepresentations in an offering memorandum, *Morin*, 747 F.Supp. at 1061, Plaintiffs have pled more than a conclusory allegation regarding the defendant KPWIC. Plaintiffs have pled that KPWIC was one of two general partners in the Partnership. This allegation is sufficient to invoke insider status because it provides the necessary "tie in" between KPWIC and the COM and partnership documents such as to "give rise to an inference of knowledge, intent, or reckless disregard." *Morin*, 747 F.Supp. at 1061. As to defendant Heffner, the complaint alleges that Heffner was an officer and director and one-third owner of KPWIC. Furthermore, Plaintiffs have pled that Heffner acted in conspiracy with other Defendants and on behalf of and as agent for KPWIC. These allegations regarding the defendant Heffner in his individual capacity are simply too conclusory to satisfy even the

---

14. For example, the *Luce* court found the following allegation to be too general for the requirements of Rule 9(b)—"During the course of the project, defendants continually misrepresented to

the plaintiffs and the class the cost, status and expected completion date of the project." *Luce*, 802 F.2d at 54.

more lenient standards of Rule 9(b) in corporate fraud cases. Unlike other Defendants who allegedly worked with the *managing* general partner Berne Corporation and were involved in the Partnership's day-to-day affairs, or, like KPWIC, served as a general partner of the Partnership, there is no such "tie-in" for defendant Heffner. Thus, all claims based on fraud (federal and state securities fraud claims, RICO claim, and state actual fraud claim) against defendant Heffner are DISMISSED. Plaintiffs are given leave to amend their complaint with respect to defendant Heffner and have 20 days from the filing of this opinion to file such an amended complaint.

■ Defendants also protest that Plaintiffs' allegations of fraud are insufficient because some of the allegations within the complaint are based on "information and belief." Allegations of fraud cannot be made on "information and belief" unless (1) the matters are particularly within the defendants' knowledge and (2) facts are stated upon which the belief is found. *Luce v. Edelstein,* 802 F.2d 49 (2nd Cir.1986). A fair reading of the complaint shows that Plaintiffs have met these requirements. The organization of the Partnership and affiliate corporations was within the particular knowledge of Defendants and the complaint contains a factual basis that reasonably forms the basis of Plaintiffs' "information and belief."

b. Elements of Actual Fraud

■ In order to establish a prima facie case of fraud in North Carolina, Plaintiffs must allege and prove each of the following elements: (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive (scienter); (4) which does in fact deceive; and (5) which results in damage to the plaintiffs. *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.,* 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988), *reh'g denied,* 324 N.C. 117, 377 S.E.2d 235 (1989). The North Carolina Supreme Court has stated that "scienter," a necessary element in a claim of fraud, "embraces both knowledge and an intent to deceive, manipulate or defraud." *Id.*

Plaintiffs have sufficiently pled the elements of fraud. Turning to the forecast of evidence, the Court refers to the earlier discussion in this memorandum opinion addressing the substantive merits of Plaintiffs' securities fraud claims. *See, supra,* section II. A.2. For the reasons stated in sections II. A.2.a. and II.A.2.c. *supra,* Plaintiffs have forecast sufficient evidence to support a jury verdict of fraud as to the Fitzgerald defendants and KPWIC on those claims relating to (1) the alleged fraud in Berne Corporations net worth statement, and (2) the alleged plan to conceal poor operating results via the monthly mailings. Thus, summary judgment is DENIED on those claims. Likewise as set out in section II.A.2.b., Plaintiffs have failed to forecast evidence sufficient to support a jury verdict of fraud pertaining to the availability of the assets of Quinter Financial Group to support the operation of the Project. Thus, summary judgment is GRANTED on this claim.

■ The fourth category of fraud—the alleged fraud in the financial projections and real estate proposal—was not discussed in section II.A.2., *supra,* because those claims were dismissed on statute of limitations grounds. Defendants have not raised the statute of limitations as an affirmative defense to common law fraud, and have thus waived such a defense. The forecast of Plaintiffs' evidence reveals, however, that Plaintiffs will not be able to prove the necessary elements of fraud. Regarding the financial projections, the record is clear that they were based on comparisons with a similar project in the same area managed by Berne Corporation. There has been no forecast of evidence that the financial projections by themselves contained a false representation or concealed a material fact.

The crux of Plaintiffs' complaint is that the real estate appraisal failed to disclose that the Partnership needed to contribute $3,000,000 to $4,000,000 in renovations before the complex would attain its estimated value as condominiums of $23,000,000. The record is clear that the appraiser, C.H. Casper, appraised the value of the apartment complex "as is" to be $13,200,000, and the value when converted to condominiums to be $23,000,000.

The written appraisal completed by Casper does not contain an amount necessary for renovations. The forecast of evidence is that Casper dealt with Addis of Berne Corporation when making his appraisal. While the two men had an understanding that renovations were necessary for the complex to achieve its appraised value as condominiums, Plaintiffs have not cited any evidence showing that Casper and Addis discussed a *particular* amount. Casper's appraisal was attached to the COM without his permission, despite the fact that his appraisal explicitly required prior permission before including the appraisal in a public document, such as a securities offering. It is undisputed that Berne Corporation budgeted $300,000 to $400,000 for renovations.

Based on the above forecast of evidence, Plaintiffs' claim of fraud based on the real estate appraisal must fail with the very first element of fraud—concealment of a material fact. Plaintiffs have forecast no evidence that any Defendants knew the appraiser had a $3,000,000 to $4,000,000 condition on his appraisal due to necessary renovations. Without knowledge of the appraiser's renovations estimate, Defendants cannot be found to have concealed a material fact. *Myers & Chapman, supra; Forbes v. Par Ten Group, Inc.,* 99 N.C.App. 587, 594, 394 S.E.2d 643, 647 (1990), *review denied,* 328 N.C. 89, 402 S.E.2d 824 (1990). Because Defendants have presented evidence that they did not know of the fact in issue, the burden shifts to the Plaintiffs to prove that the Defendants knew or had reason to know of the appraiser's $3,000,000 to $4,000,000 renovations estimate. *Forbes,* 99 N.C.App. at 594, 394 S.E.2d at 647. Plaintiffs suggest two reasons why Defendants should have known of the necessity for substantial renovations in the vicinity of $3,000,000 to $4,000,000: (1) several Defendants visited the property and witnessed the poor condition of the property; and (2) Defendants used Mr. Casper's appraisal in the COM without seeking his prior permission.

Plaintiffs have not carried their burden. The record reveals that Defendants, or persons representing Defendants, visited the Project—Mr. Fitzgerald, Mr. Heffner, and Mr. Addis. Mr. Heffner simply drove through the complex. Mr. Fitzgerald and Mr. Addis of Berne Corporation walked through the property to determine its condition and concluded that it needed much work. No reasonable fact finder could conclude that by simply visiting the property and agreeing with the appraiser that "substantial renovations" needed to be made that Defendants thereby had "reason to know" of the subjective multi-million dollar figure in the appraiser's mind. Nor is it reasonable to infer knowledge of the figure based on the inclusion of the appraisal in the COM without the appraiser's prior permission. Even assuming, *arguendo,* that Defendants are charged with knowledge of the $3,000,000 to $4,000,-000 amount, the Plaintiffs have failed to carry their burden of showing evidence of scienter, or Defendants' intent to deceive Plaintiffs with that knowledge. *Myers & Chapman,* 323 N.C. at 568, 374 S.E.2d at 391. Thus, Defendants' motions for summary judgment are GRANTED for this category of fraud.

### 2. *Constructive Fraud*

Plaintiffs have alleged claims of (1) constructive fraud and conspiracy to commit a breach of the fiduciary duties of the general partners, Berne Corporation and KPWIC, and (2) constructive fraud and conspiracy to commit a breach of the fiduciary duties of the Project's property managers, Quinter, Inc. and Cavalier Management Company, Inc. Plaintiffs have alleged that the individual defendants Fitzgerald, Barrier, Culler, Walser, Adams, and Heffner are also liable under a constructive fraud theory, acting as the agents who have caused the corporate defendants to breach their fiduciary duty to the Plaintiffs. Defendant Heffner has moved for summary judgment on the constructive fraud claims.

■ Under North Carolina law, the elements of constructive fraud are (1) the existence of a fiduciary relationship of confidence and trust, and (2) consummation of a transaction in which defendant is alleged to have abused his position of trust to the detriment of the plaintiff. *Terry v. Terry,* 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981); *Lowry v. Lowry,* 99 N.C.App. 246, 254, 393 S.E.2d 141,

145 (1990). As to the first element, defendant Heffner admits that, as an officer and director of KPWIC, he owed a fiduciary duty to KPWIC and its shareholders. He also concedes that KPWIC, as a general partner of the KPWA, owed a fiduciary duty to KPWA and the limited partners. *Casey v. Grantham,* 239 N.C. 121, 79 S.E.2d 735 (1954) (business partners are each others' fiduciaries as a matter of law). He argues, however, that his position within KPWIC does not make him a fiduciary, either in fact or in law, of any limited partner.

█ Plaintiffs argue that Heffner's fiduciary duty to the limited partners does not devolve from the corporation, but rather is based on a common law duty not to invade and disrupt the fiduciary relationships of others. Plaintiffs rely primarily on principal-agent law. It is unnecessary, however, to delve into principal-agent law to resolve this issue.[15] Under North Carolina law, the question of whether a fiduciary relationship exists is generally one of fact. *Hajmm Co. v. House of Raeford Farms, Inc.,* 328 N.C. 578, 403 S.E.2d 483, 489–90 (1991). The North Carolina courts have been hesitant to provide a strict definition of "fiduciary," but have stated that a fiduciary relationship "may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (quoting *Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896, 906 (1931)). A fiduciary relation "not only includes all legal relations, such as attorney and client, broker and principal . . . partners . . . , but it extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Abbitt,* 201 N.C. at 598, 160 S.E. at 906. *See also, State v. Seay,* 44

N.C.App. 301, 260 S.E.2d 786 (1979) (upholding trial court's definition of fiduciary as "a person having a duty created by his undertaking to act primarily for another's benefit"), *appeal dismissed,* 299 N.C. 333, 265 S.E.2d 401, *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980).

█ Thus, under North Carolina law, a person holding a corporate position (such as Mr. Heffner) will be considered a fiduciary of a third party (such as the limited partners) where he *personally participated* in the relationship with the third party such that the third party reposed confidence in the person holding the corporate position.[16] *Accord, Bankard v. First Carolina Communications, Inc.,* 1991 WL 268652 (N.D.Ill.1991), *reconsideration granted in part, denied in part,* 1992 WL 3694 (N.D.Ill.1992). The undisputed facts, taken in a light most favorable to Plaintiffs, show that defendant Heffner's personal involvement with investors was limited to two plaintiff-investors (plaintiffs Hendrick and Wilson). Both of these investors acted primarily on the advice of their accountant; thus, neither can be said to have reposed special confidence in defendant Heffner. While the most favorable forecast of evidence shows that Heffner was present when the COM was assembled, was privy to inside information, and had the ability to influence management decisions, these are not the types of activities that create a fiduciary relationship with the limited partners. Because no rational fact finder could find that defendant Heffner owed a fiduciary duty to Plaintiffs, summary judgment for defendant Heffner is GRANTED on Plaintiffs' claim for constructive fraud.[17]

### 3. The Negligent Misrepresentation Claim

Defendants argue that Plaintiffs' claim for negligent misrepresentation is barred by the exculpatory provisions in the COM and Part-

---

**15.** Plaintiffs' concerns are addressed indirectly because their argument, based on principal-agent law, is substantially similar to the North Carolina law on fiduciary duties.

**16.** Another method, of course, for imposing personal liability on an officer or director of a corporate general partner is to pierce the corporate veil. Plaintiffs have not pursued this theory.

**17.** Plaintiffs' theory that Heffner acted in conspiracy with other individual defendants to cause the corporate defendants to breach their fiduciary duties is rejected because Plaintiffs have failed to adduce any evidence of conspiracy, thus failing to carry their burden.

378

nership Agreement. The COM states the following:

> *Exculpation.* The Partnership Agreement provides that the General Partners, and their affiliates, designees and nominees, shall be liable to the Partnership or the Limited Partners only for acts performed or omitted in bad faith or due to fraud or gross negligence. This means that purchasers of Units have a more limited right of action than they would have absent such a provision in the Partnership Agreement.

COM, p. 12. The Agreement and Certificate of Limited Partnership contains the following:

> 5.7 *Limitation on Liability; Indemnification.* None of the General Partners, their affiliates, designees or nominees shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any of the Limited Partners for any loss in connection with the Partnership business if such General Partner, Affiliate, designee or nominee acts in good faith and is not guilty of proven fraud or gross negligence....

Partnership Agreement, p. 14.

██ Under North Carolina law, parties to a contract may agree to limit liability for ordinary negligence. *Tatham v. Hoke,* 469 F.Supp. 914, 917 (W.D.N.C.1979), *aff'd,* 622 F.2d 587 (4th Cir.1980); *Miller's Mut. Fire Ins. Ass'n v. Parker,* 234 N.C. 20, 22, 65 S.E.2d 341, 343 (1951). Exculpatory provisions are not favored by the law and are strictly construed against parties relying on them. Exculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power. *Tatham v. Hoke,* 469 F.Supp. 914 (W.D.N.C.1979).

██ Applying the law to the facts of this case, the exculpatory provisions in the COM and Partnership Agreement are valid. Despite Plaintiffs' arguments to the contrary, the exculpatory language is clear and unambiguous. The provision in the COM even explains: "[t]his means that purchasers of Units have a more limited right of action than they would have absent such a provision in the partnership agreement." The exculpatory clauses do not violate any statute. Nor were the provisions gained through inequality of bargaining power—the solicitation of the securities was made to a limited group of investors who met investor suitability standards. The investor-plaintiffs were free to have made other investment decisions or to have elected not to invest at all.

The more difficult issue is whether the sale of the instant securities involves a substantial public interest. Under the facts of this case, the sale of securities did not amount to a substantial public interest such as was found in *Jordan v. Eastern Transit & Storage, Co.,* 266 N.C. 156, 162, 146 S.E.2d 43, 48 (1966) (liability for personal injury by a common carrier or public utility in the course of its business cannot be limited) or *Tatham v. Hoke,* 469 F.Supp. 914 (W.D.N.C.1979) (in medical malpractice claim, clause limiting the amount of damages recoverable violates public policy). Both *Jordan* and *Tatham* concerned attempts to limit recovery for personal injury. The present case concerns economic injury due to the sale of securities. While the sale of securities concerns the public interest and is generally regulated by federal and state agencies, the sale of securities in this case does not trigger *substantial* public policy concerns. First, the limited partnership units offered for sale were exempted from registration under federal or state security laws. Second, the interests in the limited partnership units were offered not to the general public, but to a limited group of qualified investors. Third, along with the public policy of discouraging negligent misrepresentation in securities transactions, this Court must also consider the public policy to be advanced in allowing private parties of equal standing the ability to structure contracts as they wish. After scrutinizing the exculpatory language in the COM and Partnership agreement with the necessary skepticism, the Court holds that the exculpatory clauses are valid under North Carolina law.

██ Given the validity of the exculpation clause, Plaintiffs next argue that their claim for negligent misrepresentation is nevertheless *not* barred because the exculpation

clause only refers to acts of negligence, and Plaintiffs have alleged gross negligence. By its terms, the exculpation clause does not apply to acts of "fraud or gross negligence." [18] The Plaintiffs have alleged gross negligence in their complaint. Complaint, ¶ 131. Although Plaintiffs' allegation of gross negligence is in the context of a request for punitive damages, such an allegation is sufficient to put Defendants on notice of the claim against them. North Carolina courts have recognized a cause of action for "gross negligence" in allowing a fraud to be committed. *Myers & Chapman*, 374 S.E.2d at 393–394 (evidence of conscious and reckless ignorance of the truth, while not sufficient to satisfy scienter element of fraud, is sufficient for a claim of gross negligence in allowing a fraud to be committed). Similarly, if Plaintiffs can prove that Defendants acted in a grossly negligent manner, Plaintiffs' claims for negligent misrepresentation will not be barred by the exculpation clause.

Whether the Defendants or some of them acted negligently and, if so, whether the negligence was simple or gross are questions for the jury. Claims based on conduct found to be simple negligence will be DISMISSED pursuant to the exculpation clause. Those, if any, relating to gross negligence will not be dismissed.

### 4. *North Carolina's Blue Sky Law*

Plaintiffs have filed a claim under the North Carolina Securities Act, N.C.Gen.Stat. § 78A–1 *et seq.* Defendants challenge the timeliness of this action. The civil liabilities provision of the Act, N.C.Gen.Stat. § 78A–56(f) contains a two year statute of limitations as follows: "No person may sue under this section more than two years after the sale or contract of sale." Defendants argue that one sale of securities took place on December 30, 1985, making the instant action time barred. Plaintiffs counter that the action is timely due to the equitable tolling doctrine or the investment decision doctrine. These issues are thoroughly addressed in the section II.A. of this memorandum opinion and will only be discussed here to the extent necessary.

As discussed earlier, N.C.Gen.Stat. § 78A–56(f) has been held to be a statute of limitations, amenable to equitable principles. *Walker v. Montclaire Housing Partners*, 736 F.Supp. 1358 (M.D.N.C.1990). Like the federal accrual rule, North Carolina courts have long held that a statue of limitations for actions based on fraud does not begin to run until the plaintiff knows, or has reason to know, of the facts giving rise to the claim. N.C.Gen.Stat. § 1–52(9). *See, e.g., B–W Acceptance Corp. v. Spencer*, 268 N.C. 1, 149 S.E.2d 570 (1966). As discussed in section II.A.1.a., *supra*, Plaintiffs had reason to know of their securities claims based on the alleged fraud in the financial projections and real estate appraisal from the beginning of their investment due to the cautionary language in the COM. Thus, the two-year statute of limitations for those claims began to run in December of 1985 and those claims are untimely. When Plaintiffs knew, or reasonably should have known, of facts giving rise to the remaining securities claims must be resolved by a jury.

Alternatively, Plaintiffs can avail themselves of the investment decision doctrine. Although North Carolina courts have not had occasion to consider the investment decision doctrine, the North Carolina securities statute closely parallels SEC Rule 10b–5 and addresses the same policy concerns. *Skinner v. E.F. Hutton & Co., Inc.*, 70 N.C.App. 517, 320 S.E.2d 424, *modified on other grounds*, 314 N.C. 267, 333 S.E.2d 236 (1985). For this reason, the Court believes that North Carolina courts would recognize the investment decision doctrine if confronted with it. Thus, for the reasons stated in section II.A.1.a. and II.A.1.b. of this memorandum opinion, Defendants' motions for summary judgement on the North Carolina securities claims are DENIED for all claims except those relating to the real estate appraisal and financial projections.

### 5. *North Carolina's Unfair and Deceptive Trade Practices Act*

Plaintiffs have also filed a claim under North Carolina's Unfair and Deceptive

---

**18.** Plaintiffs have stated a cause of action for    fraud, discussed in the previous section.

Trade Practices Act, Chapter 75 of the North Carolina General Statutes. Courts have uniformly held that Chapter 75 does not apply to the sale of securities. *See, Lindner v. Durham Hosiery Mills, Inc.,* 761 F.2d 162 (4th Cir.1985); *Skinner v. E.F. Hutton & Co.,* 314 N.C. 267, 333 S.E.2d 236 (1985) (approving the holding of *Durham Hosiery* ); *McPhail v. Wilson,* 733 F.Supp. 1011 (W.D.N.C.1990). The Partnership interests at issue in this case qualify as securities because the investment contracts of Plaintiffs (1) involved an investment of money, (2) in a common enterprise, and (3) involved an expectation of profit solely from the efforts of others. *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *Waterman v. Alta Verde Industries, Inc.,* 643 F.Supp. 797 (E.D.N.C.1986) (finding that a cattle feeding operation constituted a sale of securities under the *Howey* test), *aff'd,* 833 F.2d 1006 (4th Cir.1987). Because this case involves the sale of securities to which Chapter 75 is inapplicable, the Court GRANTS Defendants' motions for summary judgment on this claim.

Due to the granting of summary judgment, defendants Heffner and KPWIC urge the Court to award attorney's fees to defendants pursuant to Chapter 75. Chapter 75 provides that a prevailing defendant is entitled to recover attorney fees if "[t]he party instituting the action knew, or should have known, the action was frivolous and malicious." The record reflects initial uncertainty by both parties as to whether the instant sales qualified as "securities" as opposed to real estate investments. Thus the Court finds that Plaintiffs neither knew, nor should have known, that the action under Chapter 75 was frivolous or malicious, and thereby declines to award attorneys fees to defense counsel.

## D. SECURITIES CLAIM UNDER FLORIDA'S BLUE SKY STATUTE

■ Plaintiffs have also filed claims against Defendants for violation and conspiracy to violate Florida Statute § 517.301, generally known as Florida's "little 10b–5." *See Binder v. Gordian Secur., Inc.,* 742 F.Supp.

663, 669 (N.D.Ga.1990). In order to be liable under that statute, one must have *personally* engaged in some act or acts that induced a purchaser to invest. *Binder,* 742 F.Supp. at 669, *citing Ruden v. Medalie,* 294 So.2d 403, 406 (Fla.Dist.Ct.1974). Furthermore, unlike federal securities law, Florida law does *not* allow liability to be imposed based on a "controlling person" theory. *Id.; see also* 15 U.S.C. §§ 78t(a), 77o ("controlling person").

Based on Florida securities law and the undisputed facts in this case, defendant Heffner and KPWIC's motion for summary judgment on this issue is GRANTED. There is no evidence that Heffner was ever personally involved or aided in any of the securities transactions in Florida. The Plaintiffs concede this result with respect to defendant Heffner. Regarding defendant Fitzgerald, Plaintiffs have forecast evidence of his personal involvement in the sale of securities in Florida, thus the Court DENIES his motion for summary judgment as material facts are in dispute. As there has been no forecast of evidence of defendants Barrier, Quinter Inc., Lexington Financial Corporation, or Cavalier Management Corporation's personal involvement in the securities transactions in Florida, these defendants' motion for summary judgment on this claim is GRANTED.

## E. DEFENDANT HEFFNER

Defendant Heffner has raised arguments unique to him concerning Plaintiffs' claims of (1) controlling person liability, and (2) aider and abettor liability. These arguments are now addressed by the Court.

### 1. *Controlling Person Liability*

■ Defendant Heffner challenges Plaintiffs' assertion that Heffner is secondarily liable as a "controlling person" under the Securities Act of 1933 and the North Carolina Blue Sky Act. In order to find defendant Heffner liable as a control person under either federal or state law, Plaintiffs must establish that Heffner (1) had the "power to control" the person or entity primarily liable under the applicable law, and (2) engaged in "culpable conduct." *Walker v. Cardinal Savings & Loan Asso.,* 690 F.Supp. 494, 500 (E.D.Va.1988). The "culpable conduct" ele-

ment can be satisfied by showing that the controlling person failed to maintain its system of control in a diligent manner. *Hunt v. Miller,* 908 F.2d 1210, 1215 (4th Cir.1990); *Carpenter v. Harris, Upham & Co.,* 594 F.2d 388 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). In *Hunt,* the Fourth Circuit upheld the trial court's jury instructions because the instructions accurately expressed the "failure to maintain a system of control" element, even though the terms "culpable conduct" or "culpable participation" were not formally included. *Hunt,* 908 F.2d at 1215.[19]

■ Despite Defendant's argument to the contrary, Plaintiffs have forecast evidence such that a jury could find both elements. As a director and officer of the general corporate partner KPWIC, a jury could find that KPWIC was in Heffner's control. Furthermore, Plaintiffs have forecast evidence of Heffner's failure to maintain a system of control over KPWIC—which creates an issue of fact for the jury to decide. Thus, Heffner's motion for summary judgment is DENIED and Plaintiffs can pursue the "controlling person" theory at trial.

### 2. *Aider and Abettor Liability*

■ Heffner also challenges Plaintiffs' allegation that he is liable as an "aider and abettor" of the other defendants' violations of the Securities Act of 1933. In order to be successful under an "aider and abettor" theory, Plaintiffs must establish three elements: (1) a primary violation by another person or entity; (2) the aider and abettor's knowledge of the primary violation; and (3) substantial assistance by the aider and abettor in the achievement or consummation of the primary violation. *Schatz v. Rosenberg,* 943 F.2d 485, 495 (4th Cir.1991) (aider and abettor liability did not extend to law firm because attorneys had no fiduciary duty to third parties and did not substantially assist in alleged fraud), *cert. denied,* —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). Evaluation of the

"knowledge" or scienter element depends on whether the alleged aider and abettor defendant owed a duty to the plaintiff. *Id.* at 496. When there is no duty, a plaintiff must show that the defendant possessed a "high conscious intent" and a "conscious and specific motivation" to aid the fraud. *Id.*

■ The forecast of Plaintiffs' evidence reveals that they cannot successfully show scienter or substantial assistance on the part of Heffner. As discussed earlier in section II.C.2., *supra,* no fiduciary duty ran from Heffner to Plaintiffs. Plaintiffs cannot prove that Heffner possessed a "high conscious intent" and a "conscious and specific motivation" to aid in the allegedly fraudulent acts. *Schatz,* 943 F.2d at 496. Furthermore, although Heffner has been connected to two individuals who invested in the Partnership, soliciting two limited partners out of ninety-one does not amount to substantial assistance. In addition, although Plaintiffs have alleged that Heffner reviewed and edited the monthly deficit statements to the limited partners, the record does not support such a conclusion. Thus, summary judgment is GRANTED for defendant Heffner on Plaintiffs' aiding and abetting claim.

### F. CONCLUSION

Based on the reasons set out in this memorandum opinion, the Court concludes the following. As to the federal securities claims:

(1) Defendants' motions for summary judgment based on the statute of limitations for Plaintiffs' section 10(b) securities claims are GRANTED for claims of fraud relating to the financial projections and real property appraisal, but DENIED for all other claims of fraud;

(2) Defendants' motions for summary judgment based on the statute of limitations for Plaintiffs' section 12(2) claims are GRANTED for claims of fraud relating to the financial projections and real property

---

19. The trial court in *Hunt* instructed the jury as follows:

   If [you found that Interstate was a controlling person of Jordan], did Interstate Securities Corporation take adequate precautionary measures to prevent an injury caused by an em-

ployee, supervise its employees in an adequate and reasonable fashion, and maintain its system of control in a diligent manner?
   *Hunt v. Miller,* 908 F.2d 1210, 1215 (4th Cir. 1990).

appraisal. As to Plaintiffs other claims, Defendants' motions for summary judgment are GRANTED for all sales/purchases of securities prior to September 29, 1986, but DENIED for all sales/purchases of securities on or after that date. Counsel for Plaintiffs are ORDERED to submit a list of Plaintiffs and corresponding purchase/sale records and dates to counsel for Defendants. Counsel for all parties shall confer in an effort to agree, consistent with this opinion, upon which of the Plaintiffs qualify for the investment decision doctrine. If there are Plaintiffs upon which the parties cannot agree, the names of each of those Plaintiffs and a one page statement of position from each of the parties shall be filed with the Court within 30 days from the date of this order.

(3) Defendants' motions for summary judgment are DENIED on securities claims relating to representations about Berne Corporations' net worth;

(4) Defendants' motions for summary judgment are DENIED on claims relating to the alleged plan to conceal poor operating results via the monthly mailings; and

(5) Summary judgement is GRANTED for Defendants on claims relating to the availability of assets of the Quinter Financial Group to support the Project.

The Court withholds ruling on Defendants' motions for summary judgment on the RICO claim at this time.

As to the North Carolina claims over which this Court has exercised its supplemental jurisdiction:

(1) Plaintiffs have pled fraud with the requisite degree of particularity under Rule 9(b) for all Defendants except Heffner. Thus, Plaintiffs claims based on federal and state securities fraud, RICO, and state actual fraud are DISMISSED as to defendant Heffner. Plaintiffs have 20 days from the date of this opinion to file an amended complaint meeting the requirements of Rule 9(b) regarding the defendant Heffner.

(2) Defendants' motions for summary judgement are GRANTED on the North Carolina fraud claims pertaining to (a) the availability of the assets of Quinter Financial Group to support the Projects operations and

(b) the financial projections and real property appraisal. Defendants' motions for summary judgment are DENIED for (c) the alleged fraud in Berne Corporation's net worth statement, and (d) the alleged fraud in the monthly mailings to the limited partners.

(3) Defendant Heffner's motion for summary judgment is GRANTED on Plaintiffs' claims of constructive fraud.

(4) Defendants' motions for summary judgment on the negligent misrepresentation claim are DENIED at this time pending the jury's determination of what acts, if any, were grossly negligent.

(5) Defendants' motions for summary judgment on the North Carolina securities claims based on the statute of limitations are DENIED, except for those claims based on the financial projections and real estate appraisal which are GRANTED; and

(6) Defendants' motions for summary judgment are GRANTED on the North Carolina Unfair & Deceptive Trade Practices Act claim.

Defendants Heffner, KPWIC, Barrier, Quinter Corporation, Lexington Finance Corporation, and Cavalier Management Corporations' motions for summary judgment on the Florida securities claims are GRANTED; defendant Fitzgerald's motion is DENIED.

In addition, defendant Heffner's motion for summary judgment is (1) DENIED on Plaintiffs' controlling person theory of liability; and (2) GRANTED on Plaintiffs' aider and abetter theory of liability under section 12(2) of the Securities Act of 1933.

### ORDER

Pursuant to the memorandum opinion filed contemporaneously herewith, IT IS ORDERED that

As to the federal securities claims:

(1) Defendants' motions for summary judgment based on the statute of limitations for Plaintiffs' section 10(b) securities claims are GRANTED for claims of fraud relating to the financial projections and real property appraisal, but DENIED for all other claims of fraud;

(2) Defendants' motions for summary judgment based on the statute of limitations for Plaintiffs' section 12(2) claims are GRANTED for claims of fraud relating to the financial projections and real property appraisal. As to Plaintiffs other claims, Defendants' motions for summary judgment are GRANTED for all sales/purchases of securities prior to September 29, 1986, but DENIED for all sales/purchases of securities on or after that date. Counsel for Plaintiffs are ORDERED to submit a list of Plaintiffs and corresponding purchase/sale records and dates to counsel for Defendants. Counsel for all parties shall confer in an effort to agree, consistent with the opinion, upon which of the Plaintiffs qualify for the investment decision doctrine. If there are Plaintiffs upon which the parties cannot agree, the names of each of those Plaintiffs and a one page statement of position from each of the parties shall be filed with the Court within 30 days from the date of this order.

(3) Defendants' motions for summary judgment are DENIED on securities claims relating to representations about Berne Corporations' net worth;

(4) Defendants' motions for summary judgment are DENIED on claims relating to the alleged plan to conceal poor operating results via the monthly mailings; and

(5) Summary judgement is GRANTED for Defendants on claims relating to the availability of assets of the Quinter Financial Group to support the Project.

The Court withholds ruling on Defendants' motions for summary judgment on the RICO claim at this time.

As to the North Carolina claims over which this Court has exercised its supplemental jurisdiction, IT IS FURTHER ORDERED that:

(1) Plaintiffs have pled fraud with the requisite degree of particularity under Rule 9(b) for all Defendants except Heffner. Thus, Plaintiffs' claims based on federal and state securities fraud, RICO, and state actual fraud are DISMISSED as to defendant Heffner. Plaintiffs have 20 days from the date of this order to file an amended complaint meeting the requirements of Rule 9(b) regarding the defendant Heffner.

(2) Defendants' motions for summary judgement are GRANTED on the North Carolina fraud claims pertaining to (a) the availability of the assets of Quinter Financial Group to support the Projects operations and (b) the financial projections and real property appraisal. Defendants' motions for summary judgment are DENIED for (c) the alleged fraud in Berne Corporation's net worth statement, and (d) the alleged fraud in the monthly mailings to the limited partners.

(3) Defendant Heffner's motion for summary judgment is GRANTED on Plaintiffs' claims of constructive fraud.

(4) Defendants' motions for summary judgment on the negligent misrepresentation claim are DENIED at this time pending the jury's determination of what acts, if any, were grossly negligent.

(5) Defendants' motions for summary judgment on the North Carolina securities claims based on the statute of limitations are DENIED, except for those claims based on the financial projections and real estate appraisal which are GRANTED; and

(6) Defendants' motions for summary judgment are GRANTED on the North Carolina Unfair & Deceptive Trade Practices Act claim.

Defendants Heffner, KPWIC, Barrier, Quinter Corporation, Lexington Finance Corporation, and Cavalier Management Corporations' motions for summary judgment on the Florida securities claims are GRANTED; defendant Fitzgerald's motion is DENIED.

In addition, defendant Heffner's motion for summary judgment is (1) DENIED on Plaintiffs' controlling person theory of liability; and (2) GRANTED on Plaintiffs' aider and abetter theory of liability under section 12(2) of the Securities Act of 1933.